817 A.2d 885

Earl P. BURNS, Jr.

v.

STATE of Maryland.

No. 1601, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Feb. 27, 2003.

Jennifer Cameron (Rule 16 Student Attorney) (Stephen E. Harris, Public Defender and Bradford C. Peabody, Assistant Public Defender, on the brief), Baltimore, for appellant.

Shannon E. Avery, Assistant Attorney general (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Argued before KENNEY, DEBORAH S. EYLER and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Retired, Specially Assigned.

The appellant, Earl P. Burns, Jr., was convicted by a Charles County jury, presided over by Judge Richard J. Clark, of 1) transporting a handgun in a vehicle, 2) possession of cocaine, 3)the possession of drug paraphernalia (two separate counts), 4) theft, and 5) illegal possession of a regulated firearm. On this appeal, he raises the two contentions

1. that Judge Clark erroneously denied his motion to suppress the physical evidence, and

2. that the evidence was not legally sufficient to sustain the convictions.

The appellant was one of three occupants—to wit, the right-hand, rear-seat passenger—of a two-door Chevrolet Cavalier stopped by the Maryland State Police near Waldorf at approximately 3:30 a.m. on January 14, 2001. In the car was, *inter alia*, a loaded and stolen .38 caliber handgun. The resolution of many of the sub-contentions in this case depends on the adequacy of the factual predicate to establish a connection—first at the probable cause level and then at the guilt level—between the appellant and the handgun.

### The Suppression Hearing

Four categories of evidence were introduced against the appellant: 1) the handgun found under the front passenger seat, 2) some baggies containing cocaine found on the center console, 3) a plastic tube pipe found between the driver's seat and the center console, and 4) a black baggie containing cocaine residue found in the appellant's pocket. The suppression hearing was concerned only with the baggie and cocaine residue found in the appellant's pocket. Even if the appellant were to prevail on the suppression issue, therefore, that would affect, at most, the count charging possession of cocaine and not the other five counts.

The State's theory at the suppression hearing was that the cocaine from the appellant's pocket was obtained in the course of a search incident to a lawful arrest. The arrest was based essentially on the physical proximity between the appellant and the drugs found on the center console. The appellant's theory was that the predicate arrest was unlawful.

When State Trooper Antonio J. Malaspina stopped the suspect Chevrolet on the early morning of January 14, it was unquestionably a valid traffic stop. The vehicle had been regularly weaving from lane to lane and at other times had straddled the lanes. The trooper believed that the driver was under the influence of alcohol. Accordingly, he activated his siren and his emergency lights.

At the conclusion of the suppression hearing, Judge Clark made findings of fact with respect to the arrest of the driver and the initial discovery of suspected drugs.

The officer approached the driver's side of the vehicle and he smelled an odor of alcohol, which he classified as a strong odor of alcohol coming from the passenger compartment of the vehicle. He asked the driver to step out of the vehicle and when the driver did, *he observed a plastic baggie which contained three smaller plastic baggies which contained a substance which in his training and experience the officer believed to be cocaine.*

He placed the driver immediately under arrest, searched his person, and found a crack pipe, a glass pipe used, according to Trooper Malaspina, by individuals to smoke crack cocaine, in his pocket.

(Emphasis supplied).

### An Unlawful Arrest: The Lack of Probable Cause

At that point, the trooper directed the two passengers, one of whom was the appellant, to step out of the car. As they did so, they were both placed under arrest. Shortly thereafter, the appellant was transported to the Maryland State Police Barrack, where the search incident took place. Judge Clark ruled that what had transpired prior to the arrest of the appellant did not constitute probable cause for his arrest.

What the defendant complains of is [that] his arrest was not supported by probable cause, and the search incident to his arrest, therefore, was not justified, and that the bag of cocaine, little bag of cocaine seized from his watch pocket when he was searched at the Maryland State Police Barrack ought to be suppressed.

Now, it is my belief, in connection with this matter, that when *he found the cocaine in the center console,* that Trooper Malaspina had reasonable articulable suspicion to detain the other individuals in the car. *It is my belief that simply finding the cocaine in that location,* without an indication of the smell of cocaine, the use jointly of the

people in possession of that substance, especially in light of finding a crack pipe in the pocket of the driver, *does not give the police officer probable cause to arrest everybody in the vehicle.* Certainly, there could be times when there is probable cause to do that, but simply being a person in a car in which crack cocaine is found doesn't, in my opinion, give a police officer probable cause, in and of itself, to arrest everybody in that car. . . .

. . . [The trooper] chose to arrest the defendant, and he can only arrest the defendant if he has probable cause. *I do not believe that he had probable cause to arrest the defendant,* and I believe that because he was searched pursuant to that arrest, that that search would not be a constitutional search, and the seizure of that property would not be constitutional.

(Emphasis supplied).

Although the State urges us to reverse that ruling, it is unnecessary for us to address the merits of that very particular probable cause ruling at that very early moment in the total episode. Because we are, on an alternative ground, affirming in any event Judge Clark's decision that the evidence not be suppressed, it is unnecessary for us to indulge the State and, perhaps, redundantly pile Ossa on Pelion.

We nonetheless note, in passing, that the question of the possible connection between the appellant, a backseat passenger, and a plastic baggie of suspected cocaine on the center console could have been an academically intriguing one. The fascination is that the factual situation on this issue falls halfway between *Johnson v. State,* 142 Md.App. 172, 788 A.2d 678 (2002), on the one hand, and the combination of *Wallace v. State,* 142 Md.App. 673, 791 A.2d 968, aff'd *State v. Wallace,* 372 Md. 137, 812 A.2d 291 (2002), and *Livingston v. State,* 317 Md. 408, 564 A.2d 414 (1989), on the other hand, the two positions which have served heretofore as our closest bracketing of the target. We thought the positions were close before, but we may have split the difference.

In *Wallace* and in *Livingston* it was held that the absence of any nexus, other than presence in the car, between a passenger and the contraband precluded a finding of probable cause of possession. In *Johnson*, by contrast, we held that a slight nexus between passenger and contraband was enough to establish such probable cause.

In *Livingston*, there were no factors other than Livingston's mere presence as a back-seat passenger to link him to the contraband. The Court of Appeals, 317 Md. at 416, 564 A.2d 414, concluded:

> Without more than the mere existence of two marijuana seeds located in the front of the car, we hold that the police officer lacked probable cause to arrest Livingston, a rear seat passenger, for possession of marijuana.

In *Wallace*, there was no factor other than Wallace's status as a back-seat passenger (as one of five occupants) to connect Wallace with the source of a drug-sniffing canine's positive "alert" on a car. In his opinion for this Court, Judge Kenney concluded:

> In this case, there was evidence of the commission of a crime when Bosco gave a positive alert to the Buick. This alert permitted a search of the vehicle, but, *without anything more particular to link any one passenger in the car,* including appellant, *to the drugs smelled by Bosco, the search of each individual passenger absent an arrest based upon probable cause was improper.*

142 Md.App. at 705, 791 A.2d 968 (emphasis supplied). In both of those cases, the defendants were simply passengers in a car in which contraband was found.

In *Johnson v. State*, by contrast, this Court held that an adequate connection had been shown between Johnson, a front-seat passenger and one of two occupants of a car, and the suspected contraband. When an officer stopped the car for a traffic infraction, he detected the strong smell of marijuana. He observed, moreover, a marijuana bud on the gearshift cover between the driver and Johnson. Johnson

successfully sought to distinguish his status from that of the driver.

> Johnson's argument is premised upon the notion that [the officer] had no probable cause pertaining to *him*—the passenger of the vehicle. *Even if there was probable cause pertaining to the driver,* who was operating and "controlling" the vehicle, *it may not necessarily follow that there was probable cause to believe that the passenger was involved in whatever crime that may have been committed by the driver.* Accordingly, having determined that probable cause existed as to the driver in this case, we must nonetheless continue with our analysis of probable cause to determine if it existed as to appellant as well.

142 Md.App. at 188, 788 A.2d 678 (emphasis supplied).

We held that 1) the odor of marijuana and 2) the location of Johnson "within an arm's reach of" the marijuana bud were enough to establish probable cause for the passenger's arrest and subsequent search incident. Judge Thieme reasoned:

> Based on the circumstances that existed at the time of Johnson's arrest, *it was reasonable for [the officer] to believe that Johnson was in possession of marijuana.* We find that the odor of burnt marijuana from the vehicle, along with the observation of the marijuana bud on the gearshift cover—within arm's reach of Johnson, provided [the officer] with probable cause to make a warrantless arrest of Johnson.

142 Md.App. at 190–91, 788 A.2d 678 (emphasis supplied).

Were a decision called for (it is not), the factual situation in this case manages to squeeze in between those two almost abutting ramparts. Unlike the situations in *Livingston* and *Wallace,* there is not here the total absence of any additional nexus between the passenger and the contraband. On the other hand, the nexus here, at least at the very early stage now being measured, was slighter than the nexus in *Johnson.* This scenario is truly located in the interstice.

In *Johnson,* at least two factors contributed to the possible nexus. There was first the double-barreled factor that the

contraband was "in plain view within arm's reach" of the passenger. In addition to that visual and physical proximity, the odor of burnt marijuana gave rise to the permitted inference that Johnson, one of two occupants of the car, was participating in its use.

In this case, by contrast with *Johnson*, we have a single factor, rather than two, contributing to the nexus. Although evidence developed a few minutes later permitted an inference of communal crack smoking, that evidence was not yet available at the moment for decision now under discussion. The other possibly contributing factor, however, was present. Judge Clark found, as a fact, that the glassine bag of suspected crack cocaine was in plain view on the center console. It was also, *ipso facto*, within arm's reach of the appellant. The issue could, therefore, were we to decide it, be whether a single linking strand, rather than two, would still be enough to anchor this case firmly on the *Johnson* side of the great probable cause divide.

It is another consideration, however, which makes this case a singularly inappropriate vehicle for deciding whether probable cause could have been found. The overriding procedural reality is that probable cause was not found. Although probable cause itself is a mixed question of law and fact with respect to which an appellate court may make its own independent *de novo* determination, *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the facts that go into probable cause are within the fact-finding prerogative of the suppression hearing judge. Appellate courts extend great deference to such fact-finding, unless it is deemed to have been clearly erroneous.

Whether the contraband was within the plain view of the passengers is such a fact. Judge Clark found that it was. Whether the contraband was within the appellant's arm's reach is such a fact. Implicitly, Judge Clark found that it was. Neither proximity nor plain view nor the two in combination, however, automatically establish probable cause. They are factual predicates from which the inference might arise that

the appellant was thereby exercising at least joint dominion and control over the contraband. It is that final phenomenon that would establish probable cause of possession.

In this case, Judge Clark, even if he could have done so, declined to draw that critical inference:

> In the instant case, while Trooper Malaspina certainly had probable cause to believe that the Defendant had knowledge of the presence of the drugs in the vehicle and could infer that he knew of the illegal nature of the drugs, *there were no facts articulated by the officer which would have given him probable cause to believe that the Defendant had both the power and the intent to exercise control over the drugs.*

(Emphasis supplied).

If in this case Judge Clark had actually drawn that final and critical inference, we would, of course, be highly deferential. We might well have held that the factual predicate was sufficient to permit the inference and that his drawing of the inference was not, therefore, clearly erroneous. That an inference might be permitted, however, by no means suggests that it is compelled.

Declining to draw an inference, as surely as drawing an inference, is quintessential fact-finding, something to which we remain steadfastly deferential, whichever way it goes. It is the very nature of deference, moreover, that, when the probable cause determination is based on intermediate fact-finding, the conclusion that we might have affirmed Judge Clark, had he found probable cause, by no means suggests that we would not similarly affirm him when he, based upon his fact-finding, does not find probable cause. It is quite possible (but we do not decide it) that we would have affirmed him in either event.

### Inevitable Discovery As an Alternative Theory

Having lost the opening round, the State then attempted to salvage the search by invoking the redemptive intervention of "inevitable discovery." Its thesis was that, even granting an initially unlawful arrest, 1) a subsequent search of the interior of the Chevrolet pursuant to the *Carroll* Doctrine revealed the

handgun and 2) the proximity between the appellant and the handgun would a) have established probable cause to arrest the appellant at that point, b) have resulted in its own search incident to that lawful arrest, and c) have revealed the cocaine in the appellant's pocket in any event.

The inevitable discovery notion, coming to us from *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), is an exemption from the exclusionary consequences of the larger "fruit of the poisonous tree" doctrine. It is sometimes referred to, metaphorically, as one of the ways of "unpoisoning the fruit." The theory grants the existence of a primary illegality but nonetheless holds that derivative evidence need not be suppressed if it would have been, in any event, inevitably discovered. See *Stokes v. State*, 289 Md. 155, 162–66, 423 A.2d 552 (1980).

Judge Clark, at the conclusion of the suppression hearing, reserved his ruling on the "inevitable discovery" alternative theory of admissibility and asked both parties to submit legal memoranda. In a written Opinion and Order of Court filed immediately prior to the commencement of the trial, he ruled in favor of the State on the issue of inevitable discovery.

It is this Court's finding that Trooper Malaspina, given the totality of the circumstances, had probable cause to arrest the driver of the vehicle. Pursuant to that arrest, the trooper also had probable cause to search the vehicle. It is this Court's further finding that in searching the vehicle Trooper Malaspina would have found the handgun located under the rear of the passenger seat, essentially at the Defendant's feet. Given the Defendant's location in the car and the fact that the butt of the handgun was facing the Defendant and given the totality of the circumstances, which included the Defendant's movement within the car prior to the trooper approaching it, *it is this Court's opinion that the officer would have had probable cause to believe that the handgun was possessed by the defendant and therefore probable cause to arrest the Defendant at that point. Because the Court finds that the trooper ultimately would*

*have had probable cause to arrest the Defendant and could have then searched the Defendant pursuant to that arrest, the Court finds that the drugs seized from the Defendant inevitably would have been discovered by Trooper Malaspina and therefore the Court denies the Motion to Suppress those drugs.*

(Emphasis supplied).

The arrest of the appellant and the discovery of the handgun under the right front seat were both part of a single and rapidly unfolding investigative episode. If, as Judge Clark ultimately ruled, the nexus between the handgun and the appellant established probable cause for the appellant's arrest, that connection would either 1) have ripened or "beefed up" the earlier predicate for the appellant's arrest or 2) have constituted an additional or alternative arrest to justify the subsequent search incident. To review Judge Clark's ruling as to inevitable discovery, therefore, we must determine whether the connection between the appellant and the handgun was sufficient to establish probable cause for the appellant's arrest for the crime of transporting a handgun.

## Probable Cause to Connect The Appellant With the Handgun

Whatever doubt might linger as to whether probable cause (as to the appellant) had yet reached critical mass when the driver first alighted from the left front door and Trooper Malaspina spotted the clear plastic baggie on the center console, that doubt had been resolved by the time, a minute or two later, the two passengers alighted from the right front door and the trooper recovered the .38 revolver. By that point (if not before), the substantiality of the factual predicate from which a judge might (though, of course, he need not) infer probable cause for the appellant's arrest had inexorably crossed the line that separates *Johnson v. State,* 142 Md.App. 172, 788 A.2d 678, from *Wallace v. State,* 142 Md.App. 673, 791 A.2d 968.

## A. Being Aware of the Level At Which the Bar Is Set

As we analyze the adequacy of the basis for a probable cause determination, it behooves us to remember, moreover, precisely what it is that we are measuring. In *Johnson v. State*, 142 Md.App. at 190, 788 A.2d 678, Judge Thieme quoted from the opinion of the Court of Appeals in *Johnson v. State*, 356 Md. 498, 504–05, 740 A.2d 615 (1999), as he pointed of how significantly less a connection need be shown to establish **probable cause of possession** than need be shown to support **a guilty verdict for possession.**

> "The rule of *probable cause is a non-technical conception* of a reasonable ground for belief of guilt, *requiring less evidence for such belief than would justify conviction* but more evidence than that which would arouse a mere suspicion." *Doering v. State*, 313 Md. 384, 403, 545 A.2d 1281, 1290 (1988).... We have recognized that *in dealing with probable cause, we deal with probabilities.* "These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Doering*, 313 Md. at 403, 545 A.2d at 1290.

142 Md.App. at 190, 788 A.2d 678 (emphasis supplied).

For the difference between the probable cause standard and the legal sufficiency standard, see the excellent discussion by Judge Battaglia in her dissenting opinion in *Pringle v. State*, 370 Md. 525, 559–60, 805 A.2d 1016 (2002). Judge Battaglia stressed emphatically the difference between the two things being measured, notwithstanding the confusing commonality of the subject matter of the measurements.

> I agree that the legal sufficiency of evidence in possession of narcotics cases requires the State to produce evidence of dominion or control over the narcotic allegedly possessed, and knowledge therewith, beyond a reasonable doubt. *I disagree*, however, *that the degree of evidence required for a conviction on the charge of possession of narcotics can be equated to that which is required of police officers when making probable cause determinations for warrantless ar-*

*rests. Courts reviewing such determinations must not confuse or blend the two standards:* probable cause for an arrest (a lower standard than legal sufficiency for a conviction) requires the *reasonable belief* that the person arrested had committed or was committing the felony crime of possession of narcotics. As we have oft explained, *"probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify a conviction ...."*

(Emphasis supplied).

We are not suggesting that the factual predicate about to be discussed would not have been enough, in and of itself, to support a conviction. We are only making the point that on this threshold issue of probable cause, a lot less need be shown. We are, after all, not measuring the level of certitude that must exist for a defendant to be deprived of freedom. We are only measuring the reasonableness of a non-lawyer police officer's on-the-street reaction to a rapidly unfolding confrontation. We must never forget the critical difference between these two very different measurements. The case law, however, frequently mingles these two standards of review shamelessly.

## B. The Inferrable Act of Hiding the Gun

In holding that this case is more like *Johnson* than like *Livingston* and *Wallace,* we note three additional clues, beyond the appellant's mere passenger status, that raised suspicion as to his probable connection with the handgun.

The handgun was found beneath the right front passenger seat. That seat was immediately in front of where the appellant was sitting, as a right-hand, rear-seat passenger. Trooper Malaspina testified, moreover, that, as he approached the car, he specifically observed the appellant 1) repeatedly looking back in his direction, 2) reaching around in the car, and 3) then bending down in front of him.

It might be concluded that such movements were ambiguously innocuous, but we, of course, at this juncture are taking

that version of the evidence most favorable to the State. Body movements that may be ambiguous in a vacuum, moreover, may take on clearer significance when a loaded gun is discovered within the ambit of those movements. It could reasonably be inferred that the appellant, on observing the approach of the police car, had deliberately attempted to hide the loaded weapon underneath the seat in front of him.

## C. The Communal Nature of Smoking Crack

A second clue contributes to the permissibility of the inference that the appellant was in joint possession of the handgun. It is, of course, not required that he have been in exclusive possession. It is enough that he, participating with others, may have been in joint possession. Just prior to discovering the handgun, Trooper Malaspina discovered the plastic tube pipe, an instrumentality used for smoking crack cocaine, between the center console and the driver's seat.

That fact, we hold, itself takes the case out of the *Livingston* category, where two marijuana seeds were simply found on the floor of the car, and places this case instead in the *Johnson* category, where the odor of marijuana gave rise to the permitted inference that the communal act of marijuana smoking had recently been taking place. The tube pipe's only known use is for smoking crack cocaine. Just before being stopped, the driver was observed reaching toward the center of the car, where the tube pipe was found. Inferentially, he had theretofore been holding it and, at the approach of the police, attempted to hide it or, at the very least, to put it aside. The erratic driving behavior, which was the initial cause for the stop, was corroborative of the driver's use of an intoxicant.

Crack cocaine, unlike marijuana, leaves no odor after being smoked. The fact that Trooper Malaspina detected no odor did not, therefore, gainsay the possibility that the three companions, when surprised by the police, had been smoking crack. Smoking crack, moreover, like smoking marijuana, is a communal activity, particularly in the close quarters of an automobile at 3:30 in the morning.

## D. The Linkage Between Drugs and Guns

The possible communal enjoyment of the crack cocaine is plausibly related to the possible communal (joint) possession of the loaded handgun. That handgun, significantly, was not broken down and in a case. It was not even safely stored in the glove compartment or the trunk. It was ready for use. The intimate connection between narcotics and guns, moreover, is notorious. In *Dashiell v. State*, 143 Md.App. 134, 153, 792 A.2d 1185 (2002), Judge James R. Eyler explained for this Court:

> The degree of danger present at Booth Street was compounded by the nature of drug trafficking. Persons associated with the drug business are prone to carrying weapons. *See Ybarra*, 444 U.S. at 106[, 100 S.Ct. 338] (Rehnquist J., dissenting) ("[F]irearms are as much 'tools of the trade' as are most commonly recognized articles of narcotic paraphernalia").... The connection of guns and drugs exposes officers to greater risks when confronting suspects who deal drugs.

In *Whiting v. State*, 125 Md.App. 404, 417, 725 A.2d 623 (1999), Judge Hollander similarly observed:

> We have recognized the increasingly dangerous nature of the drug trade. Indeed, we have acknowledged a nexus between drug distribution and guns, observing that a person involved in drug distribution is more prone to possess firearms than one not so involved.

In *Banks v. State*, 84 Md.App. 582, 591, 581 A.2d 439 (1990), Judge Robert M. Bell stated to the same effect:

> *Possession* and, indeed, use, *of weapons, most notably, firearms, is commonly associated with the drug culture;* one who is involved in distribution of narcotics, it is thought, *a fortiori,* would be more prone to possess, and/or use, firearms, or other weapons, than a person not so involved.

(Emphasis supplied).

The permissible street-level inference by a reasonable police officer that the appellant was involved, with his companions, in

the joint recreational use of the crack cocaine may have reinforced the permissible street-level inference that he was also in joint possession of the attendant handgun.

Judge Clark, to be sure, had initially ruled that the mere presence of the baggies of cocaine on the center console did not establish probable cause that the appellant was in joint possession of them. At that early point, however, neither 1) the discovery of the tube pipe, indicating likely use of the crack cocaine and not mere transportation; nor 2) the discovery of the handgun were yet part of the investigative calculation. The clues were rapidly accumulating.

The handgun and the tube pipe, moreover, need not be analyzed in airtight compartments, as the appellant would have us do. In combination, they reinforce each other in establishing the probable linkage of each to the appellant. When it comes to suspicious circumstances, the whole is frequently greater than the sum of its parts.

### E. "The Handle Toward My Hand"

*"Is this a[.38] which I see before me,*
*The handle toward my hand? Come, let me clutch thee."*
*... Macbeth*
Act II, Scene 1

If a hundred years of gunslinging epics has taught us anything, it is that the seat of a six-shooter in its holster can be the difference between life and death. A gun that must be turned around or turned upside down before firing is a gun that points only toward Boot Hill.

Immediately after arresting the appellant and the front-seat passenger, Trooper Malaspina began his *Carroll* Doctrine search of the Chevrolet. As he kneeled on the floor of the car by the front passenger seat and shined his flashlight underneath the seat, he discovered the loaded ".38 special" under the seat. It was closer to the rear than to the front. The barrel was pointing toward his face and the handle was facing the back seat.

Both the gun's location and its positioning were indicative of its most likely having been placed there by the appellant. It was ready for immediate use, with four live rounds and one spent cartridge. Both its placement and its directional configuration were rife with intimations of the appellant's complicity that were completely missing from the random location of the marijuana seeds in *Livingston v. State* or the undifferentiated canine sniff in *Wallace v. State.*

If the occupants of the Chevrolet had needed the .38 in a hurry, the driver could not have reached it. The front-seat passenger would have had to bend way over, to reach down between his own legs, to grab the loaded gun by the tip of its barrel, and to pull the thing toward him, a tricky maneuver under the calmest of circumstances. For the appellant, however, the .38 was perfectly positioned for a quick and easy draw. That would, *ipso facto,* qualify for what the plurality opinion of this Court in *Smith v. State,* 145 Md.App. 400, 421–25, 805 A.2d 1108 (2002), referred to as "the greater nexus."

The location of the gun was vitally important to Judge Clark's ruling that probable cause existed for the appellant's arrest. In his initial findings of fact at the conclusion of the suppression hearing, Judge Clark described the location of the gun as "under the back portion of the front seat on the passenger side of the car, immediately in front of where the appellant would have been sitting in the back seat." In Judge Clark's final Opinion and Order of Court, he referred to the fact that Trooper Malaspina "found the handgun located under the rear of the passenger seat, *essentially at the Defendant's feet.*" (Emphasis supplied). His conclusion logically followed.

> It is this Court's opinion that *the officer would have had probable cause to believe that the handgun was possessed by the Defendant* and, therefore, probable cause to arrest the Defendant at that point.

(Emphasis supplied).

We agree. The ruling was fully in tune with the command of *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), that "where the standard is probable cause, a . . .

seizure of a person must be supported by *probable cause particularized with respect to that person.*" (Emphasis supplied). It would fulfill the expectation of Judge Cathell in *State v. Wallace,* 372 Md. 137, 812 A.2d 291, that "some additional substantive nexus between the passenger and the criminal conduct must appear to exist in order for an officer to have probable cause to . . . arrest a passenger." The motion to suppress was properly denied.

### Legal Sufficiency of the Evidence

The appellant's second contention, challenging the legal sufficiency of the evidence to support the convictions, is actually a series of subcontentions calling for separate analyses.

On the third count, the appellant was convicted of the unlawful possession of cocaine. There is no issue before us as to the legal sufficiency of the evidence to sustain the conviction on that count. Both at the end of the State's case and again at the end of the entire case, defense counsel moved for judgments of acquittal "on all other counts" but expressly refrained from moving for a judgment on Count Three. He explicitly conceded that if Trooper Malaspina were believed, the recovery of a baggie with cocaine residue from the appellant's pocket was enough to support a conviction on Count Three.

### A. The Handgun Counts

Two of the counts involve the appellant's possession of the .38. The peripheral elements that distinguish the two counts from each other have nothing to do with the legal sufficiency issue now before us. Count One charged the appellant with transporting a handgun in a vehicle. The handgun in this case was indisputably being transported in a vehicle. Count Seven charged the appellant with the illegal possession of a regulated firearm by a convicted felon. The appellant was indisputably convicted in 1996 of the possession of narcotics with the intent to distribute. It was agreed by both parties that both counts would rise or fall together,

depending entirely on whether the appellant could be found to have been in possession of the handgun.

The issue is whether the evidence, and all reasonable inferences that could be drawn therefrom, was sufficient to permit the jury to conclude that the appellant was in possession, actual or constructive, joint or exclusive, of the .38 found under the seat. All of the evidence and all of the inferences previously analyzed with respect to the issue of probable cause are now relevant on the issue of legal sufficiency.

At the point when legal sufficiency must be measured, at the end of the entire case, moreover, there was significant additional evidence of the appellant's possession of the handgun, evidence that had not been developed when the suppression hearing measured probable cause of possession.

One intriguing piece of additional evidence was the testimony of the co-defendant, David Price. It was Price who had been the front-seat passenger. Price testified under oath that he had no knowledge of the baggies on the center console or of the handgun under his seat. The jury, of course, was fully entitled to believe this and to give it significant weight. Price also, to be sure, testified that he never saw the appellant in possession of either the baggies or the handgun. The jury was also fully entitled, of course, to disbelieve that and utterly to disregard it.

Taking, as we must, that version of the evidence most favorable to the State at the time we measure it, Price's testimony, if believed, could fully have exonerated him. That "take" on the evidence could effectively have reduced the number of possibly guilty persons in the Chevrolet from three to two. By process of elimination, all possible questions as to proximity, knowledge, access, nexus, etc. could have been considered and resolved, if necessary, in the more restricted universe of the appellant and the driver, with the front-seat passenger factored out of the equation.

As a matter of fact, the jury did not believe Price's exculpatory testimony, as it found him guilty on all counts. We only know that, however, by virtue of post-verdict hind-

sight. We must measure legal sufficiency, by contrast, at the point when Judge Clark was required to measure it, at the end of the entire case. Our concern is with whether Judge Clark was correct, as a matter of law, in allowing the case to go to the jury. What the jury then did with the evidence is, on this issue, beyond our purview. It is at the point of sending the case to the jury, and that point only, that Judge Clark, and now we, take that version of the evidence most favorable to the State and measure its legal sufficiency. At that point, the appellant could still have been considered as one of only two possibly guilty persons in the car, not as one of three. The obvious effect would have been to lower the exculpatory odds significantly.

Of far more significance as additional evidence was the baggie containing cocaine residue found in the appellant's pocket. The baggie in the appellant's pocket matched precisely the three baggies containing cocaine, found on the center console. It linked the appellant in as a full participant in whatever illegal possession and use had been transpiring in the Chevrolet that night. His linkage with the contraband on the center console and his clear involvement in the criminal possession (and probable use) of cocaine also gave belated meaning to his earlier and otherwise ambiguous gesturing as the police car approached. As of the later measuring point, there was not much ambiguity left. All of these circumstances, moreover, significantly strengthened the permissible inference as to the appellant's knowledge of and possession of the .38 found under the seat in front of him.

Another bit of additional evidence that developed at the trial was the appellant's explanation of how the black baggie with cocaine residue got into his pocket. The appellant testified that Trooper Malaspina planted it there. The jury, of course, was entitled to disbelieve that explanation. If it did so, palpably false exculpatory testimony became strong evidence of a consciousness of guilt. Whereas the exculpatory explanation bore only on a single count, moreover, the consciousness of guilt could be broadly applied to all counts.

We hold that the evidence was legally sufficient to permit a finding that the appellant was in possession of the handgun and that the evidence, therefore, was legally sufficient to support the verdicts of guilty on Counts One and Seven.

## B. The Possession of Paraphernalia Counts

■ There were two counts charging the appellant with the possession of narcotics paraphernalia. Count Four charged him with the possession of the clear Ziploc baggie that was recovered from the center console and which contained, in turn, three smaller black baggies, each of which contained crack cocaine. Count Five charged the appellant with the possession of the "makeshift glass stem pipe" discovered between the driver's seat and the center console.

In addition to all of the other evidence already discussed in the contexts of both the probable cause issue and legal sufficiency issue, the search of the appellant's pocket clinched his linkage with both items of paraphernalia. The clear Ziploc baggie, the subject of Count Four, contained three smaller black baggies of cocaine. A fourth such baggie, one that had contained cocaine, was in the appellant's pocket. The unavoidable inference is that the fourth baggie had come from the same stash and that the appellant was, at the very least, a joint possessor of that stash.

By the time the police got to the appellant's pocket, the cocaine was gone from his baggie and only its residue remained. The clear inference is that he had used it. That evidence of probable use helped to clinch, moreover, his connection to the makeshift glass stem pipe. The only known function of such a pipe is to smoke crack cocaine. Unless the appellant had discovered some still unheralded alternative means of getting crack cocaine into the body, his participation in the use of the pipe was highly plausible.

We hold that the evidence was legally sufficient to sustain both of the appellant's convictions for the possession of narcotics paraphernalia.

## C.   The Theft Count

■   The theft conviction, however, was "a bridge too far." The alleged object of the theft was the .38 special handgun, identified by its serial number.   The lawful owner of the handgun was one Melvin Rison.   Rison testified that his home was broken into on September 19, 2000, and that two pistols and one shotgun were stolen.   One of those pistols was the .38 found in the Chevrolet on January 14, 2001, four months later. Its value was placed at under $500.

### 1.   Criminal Possession of Stolen Goods

The Consolidated Theft Law, in effect in Maryland since January 1, 1979, is polymorphous.   Theft did not displace the multitude of larceny-related crimes that preceded it.   It embraced them.   Maryland Code, Criminal Law Article, § 7–102(a) is, in effect, the Consolidated Theft Law's general declaration of purpose.   It states:

> Conduct designated as theft in this subheading constitutes a single crime including the separate crimes heretofore known as larceny, larceny by trick, larceny after trust, embezzlement, false pretenses, shoplifting, and *receiving stolen property.*

(Emphasis supplied).

The particular form of theft charged by the State in this case is, with modest changes, what had been the pre-existing (i.e., pre–1979) crime of receiving stolen goods.   It is now spelled out by § 7–104(c), which provides:

> A person commits the crime of theft if he possesses stolen property *knowing that it has been stolen, or believing that it has probably been stolen,* and; (i) Has the purpose of depriving the owner of the property; or (ii) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or (iii) Uses, conceals, or abandons the property knowing such use,

concealment, or abandonment probably will deprive the owner of the property.

(Emphasis supplied).

## 2. The Requirement of Scienter

For present purposes, it is undisputed that the handgun in question had been stolen. There is also little question that whoever possessed the gun, jointly or exclusively, on January 14, 2001, intended to continue possessing it. That is clearly enough of a *mens rea* to satisfy the watered-down *animus furandi* of theft. The critical element of the unlawful possession in this case was the necessary scienter, the requirement of "knowing that [the stolen item] has been stolen, or believing that it has probably been stolen." Section 7–102(b)(1), in pertinent part, defines "knowingly":

When knowledge of the existence of a particular fact is an element of a crime, that knowledge is established if a person is practically certain of its existence.

Section 7–102(b)(2) goes on:

Equivalent terms such as "knowing" or "with knowledge" have the same meaning.

The mere possession of a stolen item, particularly four months after the theft, is not automatically sufficient, in and of itself, to prove a violation of § 7–104(c). Scienter is a required incremental element. In this case, the State did not offer a shred of evidence to show that the appellant knew or should have known that the gun was stolen. The State cites no case law. Its argument consists of the single sentence: "Burns's knowledge that the gun was stolen was proven by the fact that the serial number had been scratched." Not obliterated, but scratched. We do not find that to be probative of the appellant's knowledge of the gun's actual or likely history.

The passage of four months between the theft and the appellant's possession significantly attenuates the conclusion the State seeks to draw from the possession. Also attenuating the logical connection is the tenuous quality of the appellant's possession. Although we have held that the evidence was

legally sufficient to support the appellant's two convictions based upon the possession of the handgun, we nowhere suggested that his possession was necessarily exclusive rather than joint. It could have been either; it made no difference in this case. Indeed, the co-defendant, the front-seat passenger, was also found to have been in possession of the handgun. As of this writing, the courtroom fate of the driver is unknown to us.

### 3. Shifting Notions of Possession In Different Contexts

What is illustrated by the present contention is that the notion of possession in the context of one type or category of criminal behavior cannot too glibly or easily be equated with possession in the different context of another type or category of crime. All possessions are not the same, and some possessions are more logically potent than others.

With respect to crimes involving such things as narcotics or guns, for instance, the focus of the law is essentially on forbidden and dangerous behavior. The possessory crimes in those areas deliberately cast a broad net, ensnaring even peripheral participants who may be only joint possessors for an hour or two. The focus is on the conduct of the moment, and the possession may carry no deeper implications.

With respect to crimes against property, by contrast, the focus is on the item of property, and the concept of possession, either as a crime in its own right or as an evidentiary predicate for another larceny-related crime, casts a much tighter net with a narrower mesh. Particularly as an evidentiary predicate for scienter, possession generally contemplates something more by way of continuing and exclusive exercise of dominion and control over property than is required to show that a defendant was merely a participant or joint possessor in some variety of prohibited, but possibly short-lived, behavior.

### 4. Exclusive Possession v. Joint Possession

Even in larceny-related cases that have held short spans of time between the original theft and the subsequent possession to be of significance, the case law generally speaks of "exclu-

sive" possession. In *Robinson v. State*, 17 Md.App. 451, 463, 302 A.2d 659 (1973), in upholding a conviction for receiving stolen goods based on possession two months after the theft, this Court held:

> When the appellant was arrested less than two months later, that revolver, fully loaded, was recovered from under the driver's seat of *the car he alone was driving.* It is axiomatic that *exclusive possession* of recently stolen goods ... permits the drawing of an inference strong enough to sustain a conviction that the possessor was a receiver of stolen goods.

(Emphasis supplied).

In *Brewer v. Mele*, 267 Md. 437, 449, 298 A.2d 156 (1972), the Court of Appeals spoke to the same effect:

> We have long and consistently held that *exclusive possession* of recently stolen goods, absent a satisfactory explanation, *permits the drawing of an inference* of fact strong enough to sustain a conviction that the possessor was the thief, or, under appropriate circumstances, that the possessor was a receiver of stolen goods.

(Emphasis supplied).

In *Jordan v. State*, 219 Md. 36, 46, 148 A.2d 292 (1959), the Court of Appeals, in discussing the inferences that may arise from the unexplained possession of recently stolen goods, stated that

> recent and *exclusive possession* of the fruits of crime, if unexplained or explained falsely, justify the inference that the possessor is the criminal.

(Emphasis supplied). See also *Boblits v. State*, 4 Md.App. 534, 538, 243 A.2d 891 (1968) ("[T]he *exclusive possession* of recently stolen goods, unexplained, has been held to give rise to a factual inference that the possessor was guilty of receiving stolen goods.") (Emphasis supplied); *Anglin v. State*, 1 Md.App. 85, 94, 227 A.2d 364 (1967) ("*[T]he appellant's possession of the property was* recent and *exclusive* so as to create an inference of his guilt, in the absence of a reasonable

explanation showing his possession was otherwise acquired than by the particular burglaries.") (Emphasis supplied).

## 5. A Question of Fact, And Not of Law

Let it be carefully noted that we are not here announcing any absolute principle of law. We are only discussing the logical probity of factual evidence and its shifting quality from case to case. There may, of course, be factual scenarios in which joint possessors of stolen property may both, or all, be in such firm and continuing control of the property as to support an inference of mutual guilt even with respect to crimes against property. Frequently, however, the joint possession, albeit enough to convict of a crime involving forbidden behavior, does not establish enough of a connection to convict of a property crime.

As a matter of law, it cannot be said that joint possession of a stolen item either is or is not an adequate predicate from which to infer that a particular joint possessor was the thief of the item or had knowledge of the theft. There is no uniform answer. The adequacy of the predicate, as a pure matter of fact, will depend upon the random and *ad hoc* circumstances of each particular instance of joint possession.

Possession itself, simply as a matter of fact, is a variable thing. If A shares B's stolen cocaine for a convivial hour of smoking crack, A is unquestionably guilty of the joint possession of the cocaine. (Neither the charging document nor the verdict, moreover, need even mention the adjective "joint."). That set of facts would not be an adequate predicate, however, from which to infer that A was either the original thief or the subsequent unlawful possessor of stolen goods, even though the same set of facts probably would be enough to convict B. Even if A and B are both joint possessors in the same case, the circumstances of their respective possessions may vary considerably. If A shares B's stolen gun to hold up a filling station, A is unquestionably guilty of the joint possession of the handgun but could probably not, on that evidence alone, be

convicted of theft under either § 342(a) or § 342(c), although B probably could be.

### 6. Evidence Insufficient In This Case

The appellant, albeit guilty of possessing the handgun in this case, may have been on this evidence nothing more than a joint possessor for a few hours on the early morning of January 14, 2001. Without in any way depreciating the gravity of other possessions on other occasions, we hold that under the particular circumstances of this case, the appellant's mere possession of the handgun was, as a matter of law, not a sufficient factual predicate to give rise to a permissible inference that he had the required scienter for a violation of § 7–104(c). The evidence, therefore, was not legally sufficient to have permitted the theft charge to have gone to the jury.

**JUDGMENT OF CONVICTION FOR THEFT REVERSED; ALL OTHER CONVICTIONS AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND CHARLES COUNTY.**