Sharon **WOOD et al., Plaintiffs, Appellants,**

v.

**James R. CLEMONS et al., Defendants, Appellees.**

**No. 96–1078.**

United States Court of Appeals, First Circuit.

Heard June 3, 1996.

Decided July 22, 1996.

John S. Whitman, with whom Richardson, Whitman, Large & Badger was on brief, Portland, ME, for appellants.

Diane Sleek, Assistant Attorney General, with whom Andrew Ketterer, Attorney General of Maine, was on brief, Augusta, ME, for appellees.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Officers at a Maine prison received a tip that a female inmate's teenage children would be smuggling drugs into the prison in her infant granddaughter's booties. The superintendent of the prison, erroneously believing that the tip had been confirmed by two unconnected confidential informants, authorized a strip search of the visitors. In actuality, the tip had originated from a single anonymous and uncorroborated source. The strip search of the plaintiff minors turned up no drugs. Plaintiffs brought suit against the superintendent and the Commissioner of the Maine Department of Corrections under 42 U.S.C. § 1983.[1] The sole question on appeal

---

1. The named plaintiffs in this action are Sharon Wood; her son Phillip Thamert; her daughter Katrina Thamert, on her own behalf and as par-
ent of Maria Thamert; and John and Mary Foss, as parents and next friends of Michelle Hatch, Phillip Thamert's girlfriend. They purport to

is whether the district court correctly entered summary judgment on the plaintiffs' damages claim in favor of the superintendent based on his assertion of the qualified immunity defense. We conclude that the constitutionality of prison-visitor strip searches is governed by the standard of reasonable suspicion and that a reasonable official in the superintendent's position could have believed, in light of the information before him, that the searches did not violate the plaintiffs' constitutional rights. Accordingly, we affirm.

## I

The record, viewed in the light most favorable to the plaintiffs, reveals the following. Since September of 1993, Sharon Wood had been an inmate at the Maine Correctional Center ("MCC") in Windham, Maine, serving a three-year term of confinement for a drug-related conviction. From the time she was first incarcerated there, she was visited approximately every other week by her son Phillip Thamert (then seventeen years of age), her daughter Katrina Thamert (then sixteen), and Phillip's girlfriend Michelle Hatch (then seventeen). On each visit, Katrina brought along her infant daughter Maria (then seven months old). Nothing happened during any of these visits to arouse any suspicion of illegal activity on the part of Wood or her visitors. Wood had no record of drug violations while at the MCC.

The events leading to the strip search of Wood's visitors began with a telephone call to the MCC by Detective Peter Herring, the State Police Department's appointed liaison to the prison. On a "large number" of previous occasions, Herring had provided MCC officials with information obtained from his own confidential sources about criminal activity at the prison. Herring's information had invariably turned out to be accurate in the past.

On January 5, 1994, Herring called the MCC to provide another tip. Corrections Officers Charles Baker and Stephen Butts, both responsible for criminal investigations within the MCC, fielded Herring's call together. Herring told Baker and Butts that he had obtained information that inmate Sharon Wood was receiving drugs from the outside. Herring said that he had been told by a confidential informant who, in turn, had heard from an anonymous source that Wood was receiving drugs during visits, and that the drugs were being smuggled into the prison in her infant granddaughter's booties. Herring disclosed to Baker and Butts that he had obtained this information on a secondhand basis, and that at no time had Herring spoken directly to the original anonymous source about the tip. Herring himself had no personal knowledge of Sharon Wood or the persons who were supposedly bringing drugs to her. Herring did not provide Baker or Butts with the name of either his confidential informant or the original source of the tip.[2]

Soon after the phone call, Officer Baker prepared a written report of the conversation with Herring. Baker's report, however, contained an important inaccuracy. That inaccuracy may be what ultimately allowed the strip search to take place. The report implied that the information about Wood had been provided to Herring by two *independent,* mutually corroborating *confidential informants:*

> Det Peter Herring advised Butts and Baker that he received information from two separate CI's that prisoner Sharon Wood (Dorm 2) is allegedly receiving drugs during visits. Supposedly, the drugs are hidden in Wood's granddaughter's booties. Security projects office to monitor and will request appropriate action when required.

Thus, by indicating that *two* unconnected "CI's"—confidential informants—had provided Detective Herring with the same informa-

tion, Baker's report significantly overrepresented the actual reliability of Herring's tip.

Five days later, on January 10, 1994, defendant James R. Clemons, Superintendent of the MCC, met with Baker and Butts to conduct their regular weekly review of security matters at the prison. At this meeting, Clemons read Baker's report of the information received from Detective Herring. It is undisputed that, as a result of reviewing the report, Clemons came to believe in good faith that two separate confidential sources had provided Herring with precisely the same tip concerning drug-smuggling by Sharon Wood's visitors. Clemons signed Baker's report to acknowledge that he had reviewed it and to confirm that the security projects office run by Baker and Butts would monitor the situation and notify Clemons if and when any further action became appropriate. Following the January 10 meeting, no one at the MCC, including Clemons, conducted any additional investigation or follow-up concerning the Herring tip. No action was taken on the tip prior to the plaintiffs' next visit to the MCC.

That visit came on February 22, 1994. At 10:00 a.m. that morning, Officer Baker noticed the names of Wood's children on the prison visitor schedule for that day. Recalling the phone conversation with Peter Herring on January 5, Baker paged Superintendent Clemons, who was at his home, to request authorization to conduct a strip search of the visitors based on the Herring tip. About twenty minutes later, Clemons responded to Baker's page and authorized a strip search of Wood's scheduled visitors. Baker then called Detective Herring to inform him of the impending search. Herring agreed to stand by in case arrests had to be made.

Katrina and Phillip Thamert, Katrina's baby, and Michelle Hatch arrived at the prison at about 1:20 p.m. After Katrina, Phillip and Michelle signed in, Officer Baker and another officer took them aside and told them that they would have to submit to a search for contraband drugs before they would be permitted to see Sharon Wood. Baker read a "consent to search" form to the visitors, advising them of their constitutional

rights to refuse to give consent and to require the prison to obtain search warrants, and to withdraw consent at any time prior to the conclusion of the search. The form also said that if the visitors refused to consent to the search, their visiting privileges would be immediately and indefinitely terminated. Neither Baker nor the consent form made clear that the search to which the visitors were being asked to consent was a strip search. After Baker finished reading, each of Wood's visitors (except the baby) signed a consent form.

Katrina Thamert and her baby were then taken by two female officers to a private bathroom, and Phillip was taken by two male officers to a private storage room, while Michelle Hatch waited in the main reception area. Katrina was asked to remove her baby's clothing and diaper. One of the two female officers visually inspected the baby and checked the baby's clothes and diaper for contraband. Katrina held her baby at all times, and neither officer touched the baby during the search. Katrina was then told to put the baby's clothes back on. Although there were no drugs found on the baby or her clothing, the searches continued.

In the storage room, Phillip was told by the two male officers to take off his clothing, and he did so. One of the male officers searched through his clothing and visually inspected his mouth and ears. He was asked to lift his arms and his genitals. Neither officer touched Phillip at any time. He was then permitted to dress and was taken back to the reception area.

Phillip held Katrina's baby in the reception area while Katrina was searched in the bathroom by the two female officers. After removing her clothing, she was asked to lift her breasts, and then was told to squat and cough. One of the officers manually searched her clothing and visually inspected her mouth and ears. Neither of the officers touched Katrina during the search. She was permitted to dress and return to the reception area. The female officers then escorted Michelle Hatch into the bathroom and went through the same procedure as they had with Katrina.

None of the searches having turned up contraband, the visitors were permitted to see Sharon Wood. Katrina, Phillip, and Michelle told Wood about the strip searches. Following the visit, Wood filed an internal grievance with the MCC. After an internal investigation, Superintendent Clemons responded to Wood with a memorandum asserting that the strip searches had not violated any prison regulation or policy. Shortly thereafter, the Commissioner of the Maine Department of Corrections affirmed Clemons' decision. This lawsuit followed.

## II

The plaintiffs' amended complaint sought damages, an injunction, and declaratory relief for a variety of alleged constitutional violations and common law torts arising out of the strip searches. The district court, on cross-motions for summary judgment and partial summary judgment, granted the defendants' motion for summary judgment in its entirety and denied the plaintiffs' motions for class certification and to file a second amended complaint.

The plaintiffs appeal solely from the district court's entry of judgment in favor of defendant Clemons as to their claim for damages under § 1983 based on his alleged violations of the plaintiffs' Fourth Amendment rights. The only question in this appeal is whether the district court correctly concluded that Clemons is entitled to qualified immunity from the plaintiffs' damages claim under § 1983. The plaintiffs argue that Clemons is not entitled to qualified immunity here, because any reasonable official in Clemons' position would have known that the Fourth Amendment does not permit officials to undertake a strip search based on an uncorroborated tip received from a single anonymous source.

■ We review the district court's grant of summary judgment *de novo*. *See St. Hi-*

*laire v. City of Laconia*, 71 F.3d 20, 24 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2548, 135 L.Ed.2d 1068 (1996). The ultimate question of whether a defendant is entitled, on a given set of facts, to the protection of qualified immunity is a question of law for the court to decide. *See id.* at 24 n.1; *Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir.1991); *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 561 (1st Cir.), *cert. denied*, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988).

## III

■ The "touchstone" of the qualified immunity question is the concept of "objective legal reasonableness." *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Could an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the plaintiffs' constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct? *See Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995); *Singer v. Maine*, 49 F.3d 837, 844 (1st Cir.1995). Here, the plaintiffs contend that Clemons' conduct—authorizing the strip searches—violated their clearly established rights under the Fourth Amendment and fell below the operative threshold of objective legal reasonableness.

Clemons disputes the plaintiffs' position both as to the level of suspicion required to justify strip searches of prison visitors, and as to when the legal rule embracing that level of suspicion became "clearly established." [3] On the first issue, we agree with the plaintiffs that a prison-visitor strip search must be predicated upon "reasonable suspicion." Finding no need to resolve the second question, however, we conclude that the defendant is entitled to qualified immunity on

---

**3.** Clemons, appropriately, makes no serious argument that the plaintiffs' signing of the "consent to search" forms on the day of the visit constitutionally justified the searches. *See Cochrane v. Quattrocchi*, 949 F.2d 11, 14 (1st Cir. 1991) ("[A] prison visitor confronted with the choice between submitting to a strip search or

foregoing [sic] a visit cannot provide a 'legally cognizable consent,' " because "it is the very choice to which [the visitor] [is] put that is constitutionally intolerable.") (quoting *Blackburn v. Snow*, 771 F.2d 556, 568, 569 (1st Cir.1985)), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

the record here, accepting *arguendo* the plaintiffs' contention as to when the relevant law became clearly established.

### A

We begin by examining the nature of the Fourth Amendment protections to which the plaintiffs were entitled as visitors to the MCC. Although a generous amount of deference is given to prison officials on matters of prison safety, security, and discipline, *see, e.g., Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979), it is clear that visitors do not relinquish their Fourth Amendment rights at the prison gates. *See Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir.1985). Prison visitors retain the right to be free from unreasonable searches and seizures. *Cochrane v. Quattrocchi,* 949 F.2d 11, 13 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). The meaning of "reasonableness" for Fourth Amendment purposes is highly situational. A search that is reasonable in the prison environment may not be in other contexts less "fraught with serious security dangers." *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884. The standard of "reasonableness" that governs searches in a given context depends, in general, upon a balancing of "the need to search against the invasion which the search entails." *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967); *see also Blackburn,* 771 F.2d at 564.

In the volatile context of a prison, the need to preserve internal security is very strong. *See Blackburn,* 771 F.2d at 562 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). Prison officials may well have a need to search visitors in some manner in order to prevent the smuggling of contraband (such as drugs or weapons) to inmates. On the other side of the balance, people naturally have a "diminished expectation of privacy" when they enter a prison, *Blackburn,* 771 F.2d at 564, and so "those visiting a prison cannot credibly claim to carry with them the full panoply of rights they normally enjoy," *id.* at 563; *see also Spear v. Sowders,*

71 F.3d 626, 630 (6th Cir.1995) (discussing constitutionality of routine visitor searches).

However, a strip search can hardly be characterized as a routine procedure or as a minimally intrusive means of maintaining prison security. Indeed, " 'a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual.' " *Cochrane,* 949 F.2d at 13 (quoting *Burns v. Loranger,* 907 F.2d 233, 235 n.6 (1st Cir. 1990)). Accordingly, a strip search cannot be justified absent some quantum of *individualized suspicion. See Blackburn,* 771 F.2d at 564–65 (invalidating as unconstitutional a prison policy requiring strip searches of all visitors without *any* particularized suspicion of illegal activity).

In determining the *level* of individualized suspicion against which to test the constitutionality of prison-visitor strip searches with a view to striking the proper balance between respecting the legitimate privacy expectations of prison visitors and the need to maintain prison security, courts have converged upon one common benchmark: the standard of "reasonable suspicion." *See Spear,* 71 F.3d at 630; *Romo v. Champion,* 46 F.3d 1013, 1020 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 387, 133 L.Ed.2d 309 (1995); *Daugherty v. Campbell,* 935 F.2d 780, 787 (6th Cir.1991) (*Daugherty I* ), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982); *accord Varrone v. Bilotti,* 867 F.Supp. 1145, 1149 (E.D.N.Y. 1994). This court has similarly identified the reasonable suspicion standard, albeit in another context, as the one by which the constitutionality of a strip search should be determined. *See United States v. Uricoechea–Casallas,* 946 F.2d 162, 166 (1st Cir.1991) (stating, in context of border searches, that "[w]here a search is not routine (*e.g.,* a strip search), we have applied the 'reasonable suspicion' standard.") (citing *United States v. Wardlaw,* 576 F.2d 932, 934–35 (1st Cir. 1978)).

■ Without deciding the question whether or when the reasonable suspicion standard became clearly established in the prison visitor context in this circuit,[4] we now explicitly state that "reasonable suspicion" is indeed the proper standard by which to gauge the constitutionality of prison-visitor strip searches. That standard guards against arbitrary or clearly unfounded searches by placing non-trivial constraints upon the ability of prison officials to strip search visitors, see *Daugherty v. Campbell*, 33 F.3d 554, 556–57 (6th Cir.1994) (*Daugherty II*) (holding that uncorroborated tips without indicia of reliability do not create reasonable suspicion), but avoids unduly restricting prison officials in responding to the demands of institutional security. The reasonable suspicion standard thus preserves an appropriate balance between visitors' legitimate privacy interests and the government's need to search. In sum, prison officials violate the Fourth Amendment when they undertake a strip search of a prison visitor without reasonable suspicion of circumstances that justify the search. The concrete meaning of reasonable suspicion turns on the facts of each particular case.

### B

Plaintiffs can overcome the defendant's assertion of the qualified immunity defense only by showing that Clemons' conduct was objectively unreasonable in light of clearly established law. Assuming, without deciding, for purposes of our analysis here, that the reasonable suspicion standard was clearly established law by the date on which the plaintiffs were strip searched, we conclude that Clemons is entitled to qualified immunity. A reasonable official in his position could have believed that there was reasonable suspicion that the plaintiffs would be bringing drugs to Sharon Wood.[5]

■ A "reasonable suspicion" of wrongdoing is something stronger than a mere "hunch," *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968), but something weaker than probable cause. *See Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990); *Spear*, 71 F.3d at 630. At a minimum, the reasonable suspicion standard requires that the decision to search be based on articulable factual information bearing at least some indicia of reliability. *See, e.g., White*, 496 U.S. at 330, 110 S.Ct. at 2416; *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). However, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *White*, 496 U.S. at 330, 110 S.Ct. at 2416. Although an anonymous tip, standing alone, may typically fail to create reasonable suspicion, an anonymous tip that is corroborated in some measure by actual facts or by other sources may be enough. *See id.* at 329–31, 110 S.Ct. at 2415–17; *United States v. Walker*, 7 F.3d 26, 31 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994); *United States v. McBride*, 801 F.2d 1045, 1047–48 (8th Cir.1986), *cert. denied*, 479 U.S. 1100, 107 S.Ct. 1325, 94 L.Ed.2d 177 (1987).

■ Here, plaintiffs argue that the hearsay tip received by Detective Herring from his confidential informant, who had heard it from an anonymous source, did not provide reasonable suspicion, and that no reasonable official could have thought differently. The difficulty with this argument is that it seeks to defeat Clemons' claim of immunity by charging him with notice of facts that were not actually known to him at the time he made the decision to authorize the searches.

■ The issue on appeal is whether Clemons, and not any other defendant or potential defendant, is entitled to qualified immunity. The inquiry must focus on wheth-

---

**4.** Clemons contends that the reasonable suspicion standard was not clearly established in this circuit as of February 1994. He observes that this court, in its most recent published opinion addressing the issue before that time, had reserved the question, saying only that visitor strip searches require "some as-yet undefined 'level of individualized suspicion.'" *Cochrane*, 949 F.2d at 13 (quoting *Blackburn*, 771 F.2d at 567).

Plaintiffs contend that despite the statement in *Cochrane*, decisions in other circuits had made clear by February 1994 that "reasonable suspicion" was indeed the governing standard.

**5.** Plaintiffs do not argue that the Fourth Amendment required the strip searches to be predicated on any basis stronger than reasonable suspicion.

er Clemons himself acted as a reasonable official might. That determination can only be made "in light of . . . the information [that Clemons] possessed at the time of his allegedly unlawful conduct." *McBride v. Taylor,* 924 F.2d 386, 389 (1st Cir.1991); *see also Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40; *Prokey,* 942 F.2d at 72. Here, there is no dispute that Clemons was told by his staff and genuinely believed that Detective Herring had learned from *two unconnected confidential informants* that Sharon Wood's visitors were smuggling drugs into the MCC in her granddaughter's booties.

■ The plaintiffs respond by arguing that Clemons acted unreasonably in accepting Baker's report as true without conducting further investigation. We disagree. While the mistake that led to Clemons being misinformed as to the nature of the tip is not to be condoned, we cannot say, on the totality of the circumstances of this case, that Clemons was unjustified in accepting Officer Baker's report at face value. Over the course of their five-year working relationship, Clemons had grown to trust Baker to provide him with reliable information on investigatory matters. Indeed, Clemons testified at his deposition that Baker had always provided him with accurate information and, in Clemons' estimation, was "not one to make assumptions." Similarly, in Clemons' experience, information provided by Peter Herring to the MCC in a large number of previous investigations had always turned out to be accurate, and Clemons had thus come to consider Herring himself to be a reliable and trustworthy source of information. The plaintiffs do not allege that Clemons' general trust in Baker or in Herring was unjustified or misplaced.

It is only fair to conclude that Clemons had a reasonable basis to believe that the tip about Wood's visitors—as reported in Baker's memorandum—had already been tested for reliability by both Herring and Baker, and that there was no need for Clemons himself to conduct further investigation into the tip's sources. And, if Clemons reasonably believed that the tip, as reported, was reliable, it would be inconsistent with the basic purpose of the qualified immunity defense—*i.e.,* to protect an official's reasonable judgments from *post hoc* attack—to deprive Clemons of that defense merely because the nature of the tip was, through no fault of his own, erroneously reported to him.[6] *See United States v. Hensley,* 469 U.S. 221, 232–33, 105 S.Ct. 675, 682–83, 83 L.Ed.2d 604 (1985) (explaining that police officers who make an investigatory stop based on defensible reliance upon an erroneous police bulletin may assert immunity in civil suit for Fourth Amendment violations); *cf. United States v. De Leon–Reyna,* 930 F.2d 396, 399–400 (5th Cir.1991) (en banc) (border officer's reliance on erroneous information provided by dispatcher may be objectively reasonable for Fourth Amendment purposes, even if error was partly result of officer's own negligence).

Once we accept that Clemons defensibly relied upon the contents of Baker's report in making the decision to authorize the strip searches, this case can no longer be viewed (as plaintiffs would characterize it) as one in which an official knowingly relied on an uncorroborated, anonymous tip in carrying out a search. *Cf. Daugherty II,* 33 F.3d at 557 (rejecting qualified immunity defense where official authorized strip search of prison visitor based on letters from "an anonymous inmate and . . . a non-existent person" and an uncorroborated assertion of a corrections officer).[7] Instead, Clemons' authorization of

6. There is no suggestion here that prison officials deliberately or systematically misreported information to Clemons in order to obtain authorizations for strip searches. *Cf. Arizona v. Evans,* —— U.S. ——, ——, 115 S.Ct. 1185, 1194, 131 L.Ed.2d 34 (1995) (O'Connor, J., concurring) (observing that even though the good faith exception to the exclusionary rule applied where a police officer reasonably relied on an erroneous computer record in making a false arrest, the same might not be true where the computer records relied upon were known to be systematically inaccurate).

7. In *Daugherty II,* the defendant warden conceded that the letters did not form a basis for reasonable suspicion but contended that he was entitled to rely on the statements of the corrections officer. *See id.* at 557. However, there was no indication in that case that the warden had any reason to be unaware of the information's unreliability or to believe that the officer's statements (unlike Detective Herring's state-

the searches was based on a tip he believed had been received from two unconnected yet mutually corroborating confidential informants, both of whom Clemons believed had made the highly specific allegation that visitors were hiding drugs in an infant's booties for an inmate who was serving time for a drug conviction. Nor can we ignore that Clemons' assessment of the tip's reliability was favorably affected by his awareness that it had been delivered to the MCC by Peter Herring, who, to the best of Clemons' knowledge, had never before provided prison officials with information that had turned out to be false.

Viewed in this light, it is difficult to say that Clemons' decision to authorize the searches was "objectively legally unreasonable." *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039. Mindful that " 'if there is a legitimate question as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity,' " *Singer*, 49 F.3d at 845 (quoting *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir.1994)) (internal quotation marks omitted), we conclude that Clemons is entitled to the protection of that defense. An objectively reasonable official, presented with all of the information in Clemons' possession and similarly situated, could very well have believed that there existed a basis for reasonable suspicion that Wood's visitors would be smuggling drugs into the MCC.[8] *Cf. United States v. Wangler*, 987 F.2d 228, 230 (5th Cir.1993) (information provided by "two unconnected informants" contributed to reasonable suspicion that suspect was carrying drugs).[9]

## IV

We conclude that defendant Clemons is entitled to qualified immunity from personal liability for his alleged violation of the plaintiffs' constitutional right, as prison visitors, not to be strip searched except upon reasonable suspicion that they were carrying contraband. Clemons, in defensible reliance on written information provided to him by a trusted prison official, believed in good faith that a police detective with a proven track record of feeding invariably accurate investigative information to the prison had learned that *two* unconnected confidential informants had separately reported the same highly specific allegation that the visitors of a named female inmate were smuggling drugs into the prison in her infant granddaughter's booties. On the record before us, an objectively reasonable official in possession of this information and otherwise similarly situated to Clemons could have decided there was reasonable suspicion to believe that Sharon Wood's visitors would be smuggling drugs into the MCC. The district court therefore properly granted summary judgment in favor of defendant Clemons.

*Affirmed. No costs.*

ments here) were independently trustworthy. In any event, in rejecting the warden's argument, the Sixth Circuit stated, "we do not impose a duty on wardens to investigate the reliability of all their officers' conclusions." *Id.*

8. Plaintiffs do not raise, and we therefore deem waived, any argument that the tip's focus on the baby's booties precluded the existence of individualized suspicion as to Katrina Thamert, Phillip Thamert, or Michelle Hatch.

9. Of course, to say such a belief would have been reasonable is not to imply that it would have been legally correct. *Lowinger v. Broderick*, 50 F.3d 61, 65 (1st Cir.1995) ("[E]ven erroneous

decisions by officials may be entitled to qualified immunity."); *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir.1992) (" 'The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.' " (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam)) (internal quotation marks and citation omitted)). Although we sustain the defendant's assertion of the qualified immunity defense, we express no opinion as to the legal "correctness" of any belief that Clemons may have had (based on the facts as he knew them) concerning the existence of reasonable suspicion that the plaintiffs were engaged in illegal activity.