866 A.2d 870

Chris **NIEVES**

v.

**STATE of Maryland.**

**No. 2033 Sept. Term, 2002.**

Court of Special Appeals of Maryland.

March 12, 2004.

648

650

William E. Nolan (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellant.

Edward J. Kelley (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, and RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., Judge (Ret'd, Specially Assigned).

This case is one of first impression. Following the arrest of appellant, Chris Nieves, he was transported to the police station and subsequently strip searched. It is undisputed that the strip search yielded several baggies of crack cocaine that were partially protruding from appellant's rectum. He maintains that, because the officers lacked reasonable suspicion to conduct a strip search incident to his arrest for a minor offense, the search was unconstitutional and his motion to suppress the fruits of that search (*i.e.*, the crack cocaine) should have been granted.

Following the denial of his motion to suppress, appellant was convicted by the Circuit Court for Washington County of possession with the intent to distribute cocaine, possession of cocaine, and driving without a license and two other violations of the Transportation Article of the Maryland Code. For the possession of cocaine with the intent to distribute conviction, appellant was sentenced to ten years without the possibility of parole. The circuit court merged the possession of cocaine

conviction, and imposed monetary fines for the three traffic-related violations. This appeal followed and presents the following question:

Did the trial court err by denying appellant's motion to suppress the evidence seized subsequent to a strip search of appellant?

We answer "Yes" and explain.

## FACTS

Testimony at the hearing on appellant's Motion to Suppress disclosed that at approximately 7:45 a.m., Officer Ackerman was on routine patrol in the area of Wakefield Road and West Franklin Street. Officer Ackerman explained that when he stopped his vehicle behind a Toyota pick-up truck at the intersection stop sign, he noticed that the driver and sole occupant of the pick-up truck, later identified as appellant, appeared to be having some difficulty with the truck's transmission gear shift. Officer Ackerman testified that "the vehicle started to drift back as if the clutch was engaged and it wasn't in gear." The pick-up truck rolled backward and struck Officer Ackerman's police vehicle.

Officer Ackerman approached appellant's vehicle and asked appellant "if he possessed a valid driver's license," to which appellant responded that he did not. Officer Ackerman then asked appellant if he possessed "a valid driver's license in any state," to which appellant responded that he did not. At that point, Officer Jason Dietz, who had been riding in the police vehicle with Officer Ackerman, exited the police vehicle and began questioning appellant. Meanwhile, Officer Ackerman received information from the police dispatcher that the pick-up truck was registered to a female who had been reported missing for ten days.

According to Officer Ackerman, Officer Dietz asked appellant for his name, and appellant responded that his name was "Nathan Nieves." He further informed the officer that his date of birth was June 26, 1976. Officer Ackerman testified that Officer Dietz then ran a check for driver's license infor-

mation and a check for any outstanding warrants. The checks returned no information.

Officer Ackerman testified that he and Officer Dietz then advised appellant of the dispatcher's negative result, and appellant responded by providing a different first name, that of "Chris," but the same last name. The dispatcher's check of the name "Chris Nieves" revealed that appellant did not have a valid driver's license, but instead had only an identification license, which was suspended. There were no outstanding warrants.

At that time, according to Officer Ackerman, the officers placed appellant under arrest for giving false information. Officer Ackerman stated during cross-examination that the probable cause for the arrest was "for obstruction and hindering a police officer." Officer Ackerman testified that prior to appellant's arrest appellant consented to a pat-down.

Officer Ackerman testified that during the pat-down he felt "an item" in appellant's pocket. Upon receiving permission to remove the item, Officer Ackerman discovered a roll of money totaling $375.

Officer Ackerman explained that Officer Batistig had arrived on the scene, as department regulations mandate that "if one officer is involved in a motor vehicle collision another officer has to investigate that accident." Officer Batistig testified that he transported appellant to the police station upon his arrest. Officer Batistig also authored the statement of probable cause.

Upon arriving at the Hagerstown Police Station, Officer Batistig met with Lieutenant Johnson, who was investigating the case of Melissa Langford, the missing female to whom the pick-up truck was registered. When Lieutenant Johnson saw appellant, he identified him as "Chris Nieves" and explained that he knew appellant from two prior occasions related to his work with the Narcotics Task Force. Lieutenant Johnson further explained:

When they were doing the booking procedures obviously the search and subsequent fingerprint processing, photographs

and so forth I indicated to them because of his prior drug activity and the knowledge that I had at that time that he needed to be strip searched.

It was stipulated at the suppression hearing that the strip search of appellant produced two small plastic baggies, each containing smaller individually wrapped baggies of cocaine. Defense counsel entered appellant's Motor Vehicle Administration record into evidence, which stated appellant's name as "Chris Nathan Nieves" and his date of birth as June 26, 1976. The trial court denied appellant's motion to suppress.

During appellant's bench trial, the State presented essentially the same testimonial evidence as it did during the suppression hearing. Unlike at the suppression hearing, appellant testified that his name was Chris Nathan Nieves. Appellant admitted that he was under the influence of cocaine during the morning in question. Appellant testified that, when the officers informed him that the name "Nathan Nieves" did not produce any results from the police dispatcher, he "told them to add Chris in front of the name." The trial court convicted appellant of possession with the intent to distribute cocaine.

## DISCUSSION

Initially, appellant claims that his arrest was illegal because the police did not have probable cause to arrest him for obstructing or hindering the police in the performance of their duties.

Our review of the propriety of the trial court's denial of a motion to suppress evidence is limited to the record developed at the motions hearing. In determining whether the police officers' conduct was reasonable, we consider only those relevant facts produced at the suppression hearing that are most favorable to the State as the prevailing party on the motion. Although we make our own independent appraisal of whether a constitutional right has been violated, we will not disturb the trial court's factual findings unless those findings are clearly erroneous.

*Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389 (2001) (citations omitted). With respect to weighing and determining first-level facts (such as the number of officers at the scene, the time of day, whether certain words were spoken, etc.), we extend great deference to the fact-finding of the suppression hearing judge. *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003). In this case, however, the trial judge made no findings of first-level facts. The court's ruling simply stated:

> Upon consideration of the testimony submitted at the May 21 hearing, it is determined that detaining the defendant under the totality of the circumstances and subsequent search were reasonable. Therefore, the motion to suppress evidence obtained as the result of that search is, this 7th day of June, 2002, denied.

With that as our focal point, we will now consider appellant's arguments, and we will review the evidence in the light most favorable to the State, as the prevailing party. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990).

### *the arrest*

██ Although probable cause itself is a mixed question of law and fact with respect to which an appellate court may make its own independent *de novo* determination, *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the facts that go into probable cause are within the fact-finding prerogative of the suppression hearing judge. Appellate courts extend great deference to such fact-finding, unless it is deemed to have been clearly erroneous.

*Burns v. State* 149 Md.App. 526, 535, 817 A.2d 885 (2003).

"The rule of ***probable cause is a non-technical conception*** of a reasonable ground for belief of guilt, ***requiring less evidence for such belief than would justify conviction*** but more evidence than that which would arouse a mere suspicion." We have recognized that ***in dealing with probable cause, we deal with probabilities.*** "These are not technical; they are the factual and practical consider-

ations of everyday life on which reasonable and prudent men, not legal technicians, act."

*Id.* at 539, 817 A.2d 885 (quoting *Johnson v. State*, 142 Md.App. 172, 190, 788 A.2d 678 (2002)) (citations omitted).

 Appellant claims initially that the police lacked probable cause to arrest him for the common-law crime of obstructing and hindering a police officer in the performance of his duty. The Court of Appeals has set forth four elements that comprise the common-law offense of obstructing or hindering a police officer:

(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused of facts comprising element (1); and

(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2).

*DiPino v. Davis,* 354 Md. 18, 33–34, 729 A.2d 354 (1999). Apparently accepting that the police were performing their duties during their encounter with him and that he was aware that they were doing so, appellant contends that the police did not have probable cause to believe that he, by act or omission, hindered or obstructed their efforts with the intent to do so.

The State argues that, when Officer Jason Ackerman and Officer Jason Dietz reported to dispatch that appellant's truck had collided into their patrol car, they were informed that the vehicle was registered to a female whose parents had reported her missing ten days earlier. Thus, at the time of their initial encounter with appellant, the police investigation involved the auto accident and appellant's relationship to the missing female.

When the police approached appellant and asked for his license, he failed to produce one. Officer Ackerman testified that, when asked to identify himself, appellant stated that his name was "Nathan Nieves" and that his birth date was June

26, 1976. Information was run through a computer database for license status and outstanding warrants, and no results returned. Asked a second time for his identity, appellant revealed that "his name was Chris with no middle name with the same date of birth...." When the police ran the name "Chris Nieves" through the same computer database, they discovered that appellant's license to drive had been suspended by the State of Maryland. The Motor Vehicle Administration record revealed appellant's full name is "Chris Nathan Nieves," and his birth date is, in fact, June 26, 1976.

The fact that appellant initially provided his middle name in place of his first name, according to the State, constituted probable cause to arrest appellant for obstructing and hindering a police officer. Based on these circumstances, the State concludes that it was reasonable for the police to believe that appellant was trying to prevent the police from discovering his identity and driving status so that he could escape the consequences of driving on a suspended license and/or hinder the investigation into the accident and the missing female. The State ignores the fact that appellant did not provide a false or fictitious name; he simply provided his middle name as his first name, an act that is not at all uncommon. More important, appellant provided the police with his correct last name and his correct date of birth, arguably the only necessary information the police actually needed to ascertain appellant's identity. Nothing about appellant's act could possibly "lead a reasonably cautious person" to believe appellant was intending to obstruct or hinder a police officer.

Further, appellant's act did not actually cause any hindrance. In *DiPino, supra,* a police officer suspected that the plaintiff had revealed the officer's undercover status by announcing to his companion in a loud voice, and in a public place frequented by drug dealers and drug users, that DiPino and her partner were undercover detectives. *DiPino,* 354 Md. at 24–25, 729 A.2d 354. The Court found that DiPino did not have probable cause to believe that Davis had committed the crime of hindering because there was no evidence that DiPino was engaged in police activities when Davis made his

remarks, and thus no showing that Davis frustrated DiPino's ability to carry out her assignment. The Court concluded that there was no evidence that the plaintiff's remarks hindered the performance of the police officers. *Id.* at 35–36, 729 A.2d 354. "Once the remark was made," the Court stated, "they [Officer DiPino and her partner] got into their car and left, uneventfully. The assertion in DiPino's application for a Statement of Charges that she was placed in 'extreme danger' is entirely without foundation." *Id.* at 36, 729 A.2d 354. The Court ruled that the officer "had no probable cause to believe that [the plaintiff] had committed the crime of hindering by virtue of his remark to [his companion]." *Id.* at 42, 729 A.2d 354.

The State argues that *DiPino* is factually dissimilar because in this case the police were actively engaged in their investigation of the accident, appellant's driving status, and his possession of a missing person's vehicle at the time he gave his name to the police.

Here, as in *DiPino,* the State produced no evidence to demonstrate how appellant's act actually obstructed and hindered the police officers. In sum, based on the totality of the circumstances, it was unreasonable for the police to believe that appellant had provided a false name in order to hinder and/or obstruct the investigation of the car accident, his driving status, and the missing person. Accordingly, his arrest on that charge was unlawful.

Thus, even though we have determined that the police lacked probable cause to arrest appellant for hindering a police officer, a reversal would not, as appellant suggests, be required, because his arrest was otherwise justified.

■ At the suppression hearing, the State noted driving on a suspended license as a basis of authority for appellant's arrest. The simple answer is that the police had probable cause to arrest appellant for various traffic offenses, including driving without a license. Thus, the police were entitled to effect his arrest based on the traffic violations alone. *See* Md.Code (2002 Repl. Vol.) Transportation Article ("TA"),

§ 26–202(a)(2)(i) (authorizing an arrest for any violation of Maryland's traffic laws when the person has committed the violation in the presence of an officer). Appellant could not produce a valid driver's license when approached by the police and his license to drive was suspended in Maryland,[1] an offense that justifies an arrest regardless of whether the person can produce satisfactory evidence of identity. *See* Md.Code TA § 26–202(a)(3)(iv) (authorizing arrest where the officer has probable cause to believe that person is driving on a suspended or revoked license).

In his second issue, appellant argues that the strip search was impermissibly based solely on his past criminal arrest record for drug offenses and not on a reasonable articulable suspicion that he was in possession of contraband at the time of the search. We agree and explain.

### A

### The Fourth Amendment & Search Incident to a Lawful Arrest

It is axiomatic that warrantless searches conducted within the purview of the Fourth Amendment are *per se* unreasonable absent some specifically recognized exception. *Gamble v. State,* 318 Md. 120, 123, 567 A.2d 95 (1989). It is equally well settled, however, that "[a] search incident to a valid arrest is one of the limited exceptions to the warrant requirement." *Ricks v. State,* 322 Md. 183, 188, 586 A.2d 740 (1991) (citing *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). Nevertheless, the search incident to arrest exception to the warrant requirement does not give a police officer unfettered access to search the arrestee wherever and however that officer so chooses. The essential purpose of the Fourth Amendment is to impose a standard of "reasonableness" upon government searches and seizures and to limit

---

**1.** Appellant's Motor Vehicle Administration record placed into evidence at the suppression hearing shows appellant's driving privileges were suspended.

the exercise of discretion by government officials. As emphasized by the Supreme Court in *United States v. Edwards*, 415 U.S. 800, 808, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), regardless of the applicability of the search incident exception, the search of an individual must still conform to the general constraints of reasonableness:

> Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures."

(Quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).) Whether a search is reasonable requires careful scrutiny of the circumstances of each individual case. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), is the first articulation by the Supreme Court of Fourth Amendment protection against unreasonable strip searches during pretrial detention.

In *Bell*, the Supreme Court announced a balancing test that became the touchstone of Fourth Amendment analysis in the strip search context. The Court indicated several factors must be considered, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. 1861.

Having already determined that the arrest of appellant was based on probable cause and, therefore, proper, there is no question that following his arrest appellant *could have* been (and *should have* been) searched as a natural consequence of that arrest. We are called to determine, however, whether the strip search following appellant's arrest went beyond the bounds of reasonableness dictated by the Fourth Amendment.

## B

### Strip Searches Generally

Much of what is important in human life takes place in a situation not open to the entire world. The Supreme Court's

landmark decision in *Katz v. United States* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), placed privacy at the heart of the Fourth Amendment. Although there may be a lack of a precise definition of the vague and inclusive notion of privacy, that does not indicate an indifference to privacy.

Searches of the person of any variety undoubtedly invade that individual's privacy, but a strip search procedure flies in the face of individual privacy rights. Strip searches, moreover, particularly intrude upon the individual's sanctity of his own body. In *Justice v. City of Peachtree City*, 961 F.2d 188, 191 (11th Cir.1992), the Court of Appeals for the Eleventh Circuit astutely observed:

> We accept as axiomatic the principle that people harbor a reasonable expectation of privacy in their "private parts." In *Doe v. Calumet City, Illinois*, 754 F.Supp. 1211 (N.D.Ill. 1990), the court recognized that *"deeply imbedded in our culture ... is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others."*

(Internal citation omitted; emphasis added.) Likewise, *John Does 1–100 v. Boyd*, 613 F.Supp. 1514, 1522 (D.C.Minn.1985), also highlighted the degradation and invasion of privacy associated with a strip search:

> *The experience of disrobing and exposing one's self for visual inspection by a stranger* clothed with the uniform and authority of the state, in an enclosed room inside a jail, can *only be seen as thoroughly degrading and frightening.* Moreover, the imposition of such a search upon an individual detained for a lesser offense is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event.

(Emphasis added.) *See also, Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir.1996) ("A strip search can hardly be characterized as a routine procedure or as a minimally invasive means of maintaining prison security. Indeed, a strip search, by its very nature, constitutes an extreme intrusion upon personal

privacy, as well as an offense to the dignity of an individual."); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) ("Strip searches involving the visual inspection of the anal and genital areas [are] demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.") (internal quotations omitted); *Doe v. Calumet City,* 754 F.Supp. 1211, 1218 (N.D.Ill.1990) (*"Katz's* maxim that 'the Fourth Amendment protects people, not places' would have no meaning if people had no right to have their most private parts free from unreasonable searches.")(internal citation omitted). Nevertheless, the modesty of one lawfully arrested must give way to reasonable precautionary procedures designed to detect hidden evidence, drugs, or objects that might be used against others or that might cause self-inflicted harm.

The issue of strip search is like a pebble in the shoe of the judiciary.[2] Virtually every court that has addressed the issue of the permissibility of a strip search under *any* circumstances has recognized the extreme intrusiveness of that search beyond a mere search incident to arrest. In fact, in the instant case the Hagerstown Police Department Rules ("Departmental Rules") take cognizance of this intrusiveness and the problems of strip searches conducted under a blanket policy. Section 18.11.1, entitled "Strip Searches and Body Cavity Searches," provides:

This Department recognizes that the use of strip searches and body cavity searches may, under certain conditions, be necessary to protect the safety of officers, civilians and other prisoners; to detect and secure evidence of criminal activity and to safeguard the security, safety and related issues of this agency's holding facility. ***Recognizing the***

---

**2.** Aside from the obvious removal of appellant's clothing, there is no evidence as to how the strip search was conducted. Did he display his armpits, open his mouth, raise his genitals, display the bottoms of his feet? Was he required to spread his buttocks for visual anal inspection? Squat and bend from the waist several times and alternatively face toward and away as the cavities of the individual is inspected from the front and the rear? Were his anal and all cavities the focus of this inspection? Was there any touching involved in this procedure?

*intrusiveness of these searches on individual privacy, however, it is the policy of this Department that such searches shall be conducted only with proper authority and justification, with due recognition and deference for the human dignity of those being searched and in accordance with the procedural guidelines for conducting such searches as set forth in this policy.*

(Emphasis supplied.)

The Departmental Rules continue by providing that no such searches shall be permissible unless "articulable, reasonable suspicion exists."[3] § 18.11.2.2. The Departmental Rules spell out as clearly as possible when and how to conduct the search in order to eliminate the potential for abuse. Though this is a step in the right direction, there are still the larger issues looming over the whole area of strip searching, such as the meaning of reasonableness and the insuring of seemingly "fragile" privacy rights. Furthermore, there is a presumption *against* strip searching for minor or traffic offenses, absent some suspicion that the arrestee is in possession of contraband or weapons.

In *Logan v. Shealy,* 660 F.2d 1007, 1010 (4th Cir.1981). A woman who was arrested for driving while intoxicated was strip searched pursuant to a blanket policy that required all temporary detainees to be strip searched. The court used the four factors of the *Bell* balancing test to analyze the constitutionality of the search. The court stated that the strip search bore no discernible relationship to security needs at the detention center and that, when balanced against the ultimate invasion of personal interests involved, the policy could not reasonably be justified. The court noted that there was no intermingling of pretrial detainees with the prison population, that the offense was not one commonly associated by its nature with the possession of weapons or contraband, that there was no specific cause to suspect the plaintiff, and that

---

3. Appellant does not challenge the notion that reasonable suspicion is the proper standard by which his strip search could have been justified.

when the plaintiff was strip searched she had already been at the detention center for over one and one-half hours without undergoing even a pat-down search, indicating that the law enforcement officials themselves were not particularly concerned that she might be concealing weapons or contraband. The Fourth Circuit held that the policy was unconstitutional.

Following the dictates of *Logan, Smith v. Montgomery County*, 643 F.Supp. 435, (1986), dealt with strip searching detainees. Smith was arrested at her home for failing to appear before the Circuit Court for Montgomery County in a child support action. At the station she was ordered to remove her clothing and to squat for a visual body inspection. She was then placed in a holding cell overnight. She subsequently brought suit against Montgomery County and several other officials claiming the Detention Center's policy of strip searching all temporary detainees was unconstitutional. Judge Young held that blanket strip and visual body cavity search policy covering all temporary detainees at the county detention center did not violate the Fourth Amendment with regards to felony arrestees and those misdemeanor offenders for whom there was individualized reasonable suspicion that they were concealing weapons or contraband [4]. ("Individuals arrested for traffic violations and other minor offenses of a nonviolent nature *shall not* be subject to strip searches unless the arresting officer has articulable reasonable suspicion to believe that the individual is concealing contraband or weap-

---

**4.** Although numerous courts have invalidated police policies which permitted strip searches for minor offenses without any individualized suspicion, *see, e.g., Stewart v. Lubbock County*, 767 F.2d 153 (5th Cir.1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986), and *Weber v. Dell*, 804 F.2d 796 (2nd Cir.1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), numerous courts that have addressed the issue have held that a strip search for a minor offense may permissibly be based on reasonable suspicion and need not rise to the heightened standard of probable cause. *See Masters v. Crouch*, 872 F.2d 1248, 1253 (6th Cir.), *cert. denied*, 493 U.S. 977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989) ("We have found no authority approving a practice of conducting a strip search of a person arrested for a simple traffic violation in the absence of at least reasonable suspicion that the person might be carrying a weapon, illegal drugs, or other contraband.").

ons.") § 18.11.5 (emphasis added). It is the responsibility of the officer requesting the strip search to clearly articulate the basis for that search. § 18.11.2.2.

Based on the above-quoted Departmental Rules, the following can be gleaned as to the policy of the Hagerstown Police Department with regard to strip searches: First, strip searches by their very nature are highly intrusive and, regardless of the crime for which an individual is arrested, such searches should only be conducted with proper justification and in a proper manner; second, for minor or traffic offenses, strip searches **shall not** be conducted unless the arresting officer has a reasonable suspicion that the individual is presently in possession of weapons and/or contraband; and third, the burden lies on the arresting officer clearly to articulate the basis upon which reasonable suspicion is based.

As fully explored in Part I, *supra,* there was probable cause to arrest appellant for a minor traffic offense. In order for the strip search of appellant to have been permissible in the instant case, that search must have been based on some articulable reasonable suspicion that he was **presently** in the possession of weapons or contraband.

## C

### Articulable Reasonable Suspicion Justifying Appellant's Strip Search

■■■ Although the majority in *Wolfish* upheld the strip searches conducted there on less than probable cause, the detainees were awaiting trial on serious federal charges after having failed to make bond and were being searched after contact visits. In the case before us, however, the appellant is a minor offender who was not inherently dangerous. In light of the substantial nature of the intrusions involved, we believe these differences are sufficiently significant to compel our own independent inquiry as to whether the strip searches conducted were "reasonable" under the Fourth Amendment. Thus we must balance the need for the particular search against the invasion of personal rights that the search entails by consider-

ing the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted, *Bell*, 441 U.S. at 559, 99 S.Ct. 1861.

■ Given the uncontroverted intrusion of a strip search, it logically follows that "the more intrusive a search is upon personal rights, the more the government must demonstrate justification for conducting the search." *Justice v. City of Peachtree, supra*, 961 F.2d at 192. We thus seek to determine precisely what justification the officers had to initiate a strip search of appellant in the case sub judice.

■ A strip search is permissible only if the official has an individualized suspicion that an arrestee is hiding weapons or contraband. This suspicion must relate to the "individual," not a "category of offenders," such as drug users.

■ The Supreme Court in *Terry v. Ohio* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), stated that the "reasonable suspicion" standard is satisfied if the officer observes "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous. . . ." *Id.* at 30, 88 S.Ct. 1868. Thus, reasonable suspicion demands that the official conducting the search point to specific objective facts that criminal activity is afoot and rational inferences that they are entitled to draw from those facts in light of their experience. Inchoate, unspecified suspicions do not meet this definition.

■ When formulating articulable reasonable suspicion, The Departmental Rules provide guidelines as to what factors may be taken into consideration by the arresting officer:

Reasonable suspicion may be based on, but is not limited to:

★ The nature of the offense charged.

★ The arrestee's appearance and demeanor.

★ The circumstances surrounding the arrest.

★ The arrestee's criminal record, particularly past crimes of violence and narcotics offenses.

★ The discovery of evidence of a major offense in plain view or in the course of a search incident to the arrest.

★ Detection of suspicious objects beneath the suspect's clothing during a field search incident to arrest.

§ 18.11.5. When considering those factors as well as the general proscription that a search must be reasonable, the State failed to satisfy its burden that appellant's strip search was conducted based on a reasonable articulable suspicion that appellant had either weapons or contraband in his possession. There is no Fourth Amendment right to secrete such evidence.

At the suppression hearing, Lieutenant Richard Johnson, of the Hagerstown Police Department, testified as to the events of January 22, 2002, subsequent to appellant's arrest. Lieutenant Johnson first elaborated upon his recognition of the appellant while at the police station:

> When they arrived with the ... the individual, the defendant, he had given them one particular name and at the time I told them, I said, "Well that's not how I know him. His name is Chris Nieves." And I had had personal contact on two different occasions when I was at the Narcotics Task Force with Chris.
>
> \* \* \*
>
> Well there w[ere] two particular incidents. One was in April of 2000. The other one was in May of 2000. In April we conducted a search and seizure warrant down at 269 South Prospect Street, and as a result of that search and seizure warrant the defendant was arrested on drug charges. Then ... on May thirty-first out on Jefferson Boulevard, myself and Agent Moran and Agent Sleigh [ ] went to a residence on Jefferson Boulevard because there was alleged drug activity taking place. And we went in and made contact with the individuals who were at the house, one of them being the defendant, Chris Nieves, and he was subsequently arrested. And when taken to the Detention Center we found monies and also drugs on his person at that time. Again he was arrested.

Lieutenant Johnson was next questioned regarding the events that led to the eventual strip search of appellant. The following transpired:

Q: And what action, if any, did you take at that time?

A: When they were doing the booking procedures obviously the search and subsequent fingerprint processing, photographs and so forth I indicated to them because of his prior drug activity and the knowledge that I had at that time that he needed to be strip searched.

\* \* \*

Q: And you gave that order?

A: Yes, I did.[5]

Q: *Besides the information regarding the missing person and the prior history of drugs, what ... was there anything else that you based the order on or was that it?*

A: *No, that was it at the time.*

(Emphasis added.)

Based on Lieutenant Johnson's testimony as the ranking officer and the officer who ordered the strip search in the instant case, he admitted that his order for the strip search was given based only on two factors: (1) knowledge of the appellant's drug history; and (2) the fact that the vehicle being driven by appellant at the time of his arrest was registered to a missing female suspected in narcotics dealings. Neither factor alone nor the combination of the two supports the conclusion that a reasonable articulable suspicion was present to justify the strip search.

As to appellant's prior drug arrests, certainly they are relevant in the consideration of the totality of the circum-

---

5. In the instant case, the officers on the scene of the arrest *were not* the officers requesting that a strip search be conducted. By the unambiguous language of the Department Rule, the request for a strip search *must* come from the arresting officer with ample justification for that request. This issue was neither raised in the Circuit Court nor before this court.

stances, yet we are mystified as to how the fact that appellant had two drug arrests *two years prior* to the arrest in the instant case together with the fact that he is driving the truck of a drug user with the record silent as to whether the appellant even knew the drug user, somehow leads one to articulable suspicion that appellant had contraband on his person *at the time of his arrest on January 22, 2002.* The question is not was there articulable suspicion to search, but rather, was there articulable suspicion to *strip* search. *Where is the reasonable suspicion that drugs or other contraband are concealed in the particular place they decide to search?* There simply is none.

Appellant argues in his Brief that "[a]llowing the police to conduct strip searches based solely on a defendant's past criminal arrest record creates a *per se* rule that shifts the determination of reasonable suspicion from the *individual arrestee* to a class or category of offenders." (Emphasis in original.) Appellant raises a valid point. We too are troubled by the fact that, *any* time an individual has a prior drug history, that history alone may be used to justify a strip search of the individual upon subsequent arrests for minor offenses. What if the arrests had occurred not two years ago but five years ago instead? Or ten years ago? Should a distinction be made between a prior drug arrest and a prior drug conviction? These questions, in our view, create at least a reasonable possibility that police officers, with nothing more than the mere knowledge that an individual has at some point in the past been involved in narcotics, will use that fact to justify the extraordinary invasion of privacy in the form of a strip search. Officers on nothing more than a "fishing expedition" for narcotics without any articulable suspicion whatsoever will essentially be given *carte blanche* to violate an individual's privacy when arrested for a minor offense.

As to the second factor enunciated by Lieutenant Johnson as a basis for his ordering the strip search, we are equally troubled. Granted, appellant was driving a vehicle registered to a missing woman who was suspected in drug activity. Were it that female who had been driving the truck on

January 22, 2002, then perhaps, depending on the extent of the knowledge the officers had of her drug involvement, reasonable suspicion could have existed that the female was presently in possession of contraband. Nevertheless, we feel it far too great a leap to conclude that any possible narcotics involvement of the missing female *ipso facto* carried over to appellant simply because he was the driver of that vehicle. The record is devoid of evidence suggesting that, at the time of his arrest, appellant even knew who the missing female was.[6]

Although the present issue has never specifically been addressed by Maryland's appellate courts, in *Fontaine v. State,* 135 Md.App. 471, 762 A.2d 1027 (2000), Judge James Eyler, speaking for this Court, did have an opportunity to discuss a strip search that yielded contraband. In that case, Fontaine was stopped in Delaware pursuant to information that he had been driving while suspended in Maryland and that he did not have a valid license in any other state. Upon stopping the vehicle, the officer specifically noticed Fontaine fidgeting and "attempting to stick something down the rear of his pants." *Id.* at 475, 762 A.2d 1027. Additionally, the officer had specific information of where Fontaine normally concealed his narcotics. Following a pat-down on the scene, Fontaine was transported to the Delmar Police Department where he was strip searched and quantities of crack cocaine were recovered from his buttocks. *Id.* at 476, 762 A.2d 1027.

*Fontaine* does not deal with a challenge to the propriety of the strip search directly, but nonetheless it is instructive on the degree of reasonable suspicion necessary to justify the strip search. In that case, the officer observed first-hand Fontaine's placing something in the area of his buttocks and, when coupled with specific knowledge of where he normally kept such drugs, the strip search was reasonable.

---

6. It was never suggested below that appellant was in any way responsible for the female's disappearance or that she had met with foul play. In fact, the female was located a short time after appellant's arrest in West Virginia with her live-in boyfriend.

In the case at bar, we have nothing that even approaches the facts before us in *Fontaine*. Appellant here was described as being "calm and relaxed" during the encounter at the scene of the arrest. He consented to a pat-down, and he in no way resisted the officers' efforts to arrest him or transport him to the police station. No furtive movements were observed and neither were any attempts made by appellant to hide or conceal anything on his person. Additionally, according to the testimony of Officer Jason Ackerman, who was present at the scene of the arrest, a search of the vehicle on the scene yielded "nothing else extraordinary." *Fontaine*, therefore, only lends credence to our position in the instant case that significantly more is needed than the justification provided by Lieutenant Johnson for the strip search of appellant.

## D

### Conclusions

In conclusion, when considering the totality of the circumstances as outlined in the Departmental Rules and relevant case law defining reasonable suspicion, they are devoid of any additional cause to strip search appellant.

Appellee during oral arguments curiously noted that this case is about "drug overtones." Drug overtones, however, simply do not equate to an articulable reasonable suspicion that appellant was in possession of contraband at the time of his arrest. Therefore, given the undisputable invasion of privacy that appellant was subjected to, the State failed to articulate a reasonable suspicion justifying the constitutionality of the strip search.

**JUDGMENT REVERSED IN PART.**

**COSTS TO BE PAID BY WASHINGTON COUNTY.**