## COMMERCIAL LAW

LIQUEFIED PETROLEUM GAS CONTAINERS – POTENTIAL CRIMINAL LIABILITY OF SUPPLIERS THAT REMOVE COMPETITOR'S TANK

November 21, 2013

*The Honorable Edward D.E. Rollins, III*
*State's Attorney for Cecil County*

The Maryland Liquefied Petroleum Gas Container Law makes it a misdemeanor, among other things, to "take," "or otherwise use, dispose of, or traffic in" a liquefied petroleum gas ("LPG") storage tank marked as belonging to another without the written consent of the owner. Md. Code Ann., Comm. Law ("CL") §§ 11-603, 11-604, 11-606 (2013 Repl. Vol.); *see generally* CL §§ 11-601 *et seq*. You ask whether an LPG supplier may be prosecuted under the Container Law for acts committed in the course of replacing another company's underground LPG tank on the customer's property with its own tank, presumably with the consent of the customer. Specifically, you ask whether the supplier can be charged under the Container Law for leaving the other company's partly-filled LPG tank by the side of the road without the other company's written consent.

In our opinion, it would be problematic to charge the supplier for violating the Container Law when the supplier has excavated the tank and left it on the customer's property. Conversely, we think it would be possible to prosecute the supplier under the Container Law when the supplier, without the other company's written consent, has left the other company's tank in the road itself or "by the side of the road" in a place beyond the control of both the customer and the other company. Whether to prosecute the supplier in a particular case will thus depend on where the new supplier left the tank, and on other factors such as the customer's role in the supplier's actions, the customer's contractual obligations to the first supplier, and the notice, if any, given to the first company.

The Container Law, however, is not the only option for prosecuting an LPG supplier for leaving another company's partly-filled propane tank by the side of a public road. Although other statutes are not the focus of this opinion, criminal actions might be brought under § 3-204(a) of the Criminal Law Article for reckless endangerment, or under the Public Safety Article for the knowing violation of the State Fire Prevention Commission's regulations,

*see* Md. Code Ann., Pub. Safety ("PS") § 6-601 (2011 Repl. Vol.), or for using equipment in a way that "endangers life or property due to the hazards of fire or explosion." *Id*. § 6-317(a)(1). The theft provisions in the Criminal Law Article might also apply, as might other laws ranging from local littering and nuisance ordinances to federal regulations on the safe transport of LPGs.

# I

# Background

## *A    Liquefied Petroleum Gas*

"Liquefied petroleum gas," also known as "LP-gas" or "LPG," is a catch-all term for a mix of several hydrocarbons (including propane and butane) stored under pressure sufficient to convert the gas into a liquid. It is often referred to simply as "propane" or "bottled gas." *NIOSH Pocket Guide to Chemical Hazards*, http://www.cdc.gov/niosh/npg/npgd0679.html (last visited Nov. 12, 2013). First used for cooking and domestic heating purposes in 1912, LPGs began to be widely marketed in the 1930s. *See generally* National LP-Gas Council, *The First Fifty years of LP-Gas: An Industry Chronology* (1962), http://www.npga.org/files/public/LPGA_Times_1962_History.pdf ("*First Fifty Years*"). By 1950, the trade association's history reports, "LP-gas was truly big business." *Id*. at Ch. 7, 19.

As the use of LPG spread, so too did the recognition of its risks. By 1953, it was "well-known" that LPG had the "tendency to escape and become an element not only entailing possible but probable death and disaster." *Thompson v. Econ. Hydro Gas Co.*, 363 Mo. 1115, 1124 (1953). Today, the National Oceanic and Atmospheric Administration ("NOAA") includes the following warning on datasheets used, among other things, to guide emergency responders:

> EXTREMELY FLAMMABLE. Will be easily ignited by heat, sparks or flames. Will form explosive mixtures with air. Vapors from liquefied gas are initially heavier than air and spread along ground. . . . Vapors may travel to source of ignition and flash back. Cylinders exposed to fire may vent and release flammable gas through pressure relief devices. Containers may explode when heated. Ruptured cylinders may rocket.

NOAA, Computer-Aided Management of Emergency Operations Database, *Liquefied Petroleum Gas*, http://cameochemicals.noaa.gov/chemical/987 (last visited Nov. 12, 2013). In addition to the fire hazard it presents, spilled LPG can freeze skin on contact; NOAA advises responders to "[w]ear appropriate personal protective clothing to prevent skin from becoming frozen from contact with the liquid or from contact with vessels containing the liquid." *Id.*

Efforts to control the risks of LPG emerged with the fuel's growth in popularity. In 1932, the National Board of Fire Underwriters—now the National Fire Protection Association ("NFPA")—issued model codes for handling LPGs, including "Pamphlet 58," which was entitled "A Liquefied Petroleum Gas Code." *See NFPA 58, Liquefied Petroleum Gas Code* at 1 (2014 ed.), *available at* https://www.nfpa.org/codes-and-standards/document-information-pages?mode=code&code=58 (listing the revisions to the NFPA LP-gas standards since 1932); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 495-96 (1988) (describing NFPA Code). Now known as "Code 58" or "NFPA 58," the current model code contains 100 pages of model regulations organized into twelve categories of standards for the "storage, handling, transportation, and use of LP-Gases." *See* NFPA 58, § 1.1, at 58-7. The NFPA has incorporated NFPA 58 into *NFPA 1: Fire Code* ("Code 1"), which is a compendium of the various NFPA codes and many other fire safety standards. Code 1, § 2.2, at 1-25 (2012 ed.), *available at* http://www.nfpa.org/codes-and-standards/document-information-pages?mode=code&code=1.

As of 2007, all fifty states had adopted NFPA 58 in some form. *See* National Propane Gas Ass'n, Current State Adoptions of NFPA 58, http://www.npga.org/files/ public/NFPA_58_State_Adoptions_ 2-07.pdf (last visited Nov. 12, 2013). Maryland has adopted NFPA 58 through regulations promulgated by the Maryland State Fire Prevention Commission. Under a Maryland law first enacted in 1964, *see* 1964 Md. Laws, ch. 46, § 1, the Fire Commission must "adopt comprehensive regulations as a State Fire Prevention Code" in order to "protect life and property from the hazards of fire and explosion." PS § 6-206(a)(i); 2005 Md. Laws, ch. 5, § 2 (recodifying the statute). The Fire Code, the statute stipulates, must "comply with standard safe practice as embodied in widely recognized standards of good practice for fire prevention and fire protection." PS § 6-206(a)(ii). The Fire Code promulgated by the Fire Commission incorporates most of NFPA Code 1, including the portion that in turn incorporates NFPA Code 58. *See* COMAR 29.06.01.06 (incorporating NFPA Code 1 (2012 ed.) by reference);

NFPA Code 1, §§ 2.1, 2.2 (incorporating NFPA 58, Liquefied Petroleum Gas Code, by reference).

NFPA 58 is now the industry standard. As one court has observed, "Propane is relatively safe if it is handled in accordance with these regulations. It is when the precautions prescribed by NFPA 58 are not taken that handling propane becomes extremely dangerous." *Apodaca v. AAA Gas Co.*, 134 N.M. 77, 88-89 (N.M. Ct. App. 2003).

### B. *The Provision of LPG Storage Tanks for Residential Use*

In part due to the risks involved with the storage and handling of LPGs, gas companies typically maintain control over the tanks used to supply LPG to residential customers. As we understand it, most contracts between a residential customer and an LPG supplier specify that the supplier will install its own tank and related equipment on the customer's property and will deliver the LPG to that tank. The customer leases the tank and pays for the product, usually when delivered, but in some cases on the basis of metered usage. A contract might also require the customer to give the supplier advance notice of the customer's intention to terminate the service, to provide the supplier with unlimited access to the equipment, and to allow access to the equipment only to the supplier. *See*, *e.g.*, Amerigas, Terms and Conditions for Residential Customers, §§ 11, 8, 7, http://www.amerigas.com/residential/pay billing_terms.htm (last visited Nov. 12, 2013). The customer's duty to safeguard the tank thus depends on the contract, as does the exact nature of the customer's possessory interest in the leased tank.

The duty that one supplier owes to another is governed not by contract but by industry practice. As a matter of courtesy, a supplier who is about to take over a customer's account and install its own tank will often arrange with the current supplier for the disposition of the first supplier's tank. It is our understanding that gas companies handle these transitions in different ways. The two suppliers may coordinate to remove the old tank and install the new one at the same time, with the old supplier hauling its tank to its facility. Or, the new supplier may perform the excavation itself and haul the old tank back to its own facility and make subsequent arrangements for the old supplier to collect its tank. Finally, the two competitors may sometimes effect a "steel swap," by which the new supplier assumes ownership of the buried tank and gives the old supplier a substitute tank. None of these alternatives is prescribed by law.

## C.   *The LPG Container Law*

Although Maryland law does not regulate expressly the transition from one residential LPG supplier to another, it does protect each company's ownership rights in its tanks. The Container Law, which was originally enacted in 1968, *see* 1968 Md. Laws, ch. 533, applies to any container with a total capacity of over five gallons that bears the mark of the company that owns it and restricts the use of that tank by any other entity:

> **§ 11–603**.
>
> Unless he is authorized by the owner in writing, a person other than the owner of a container may not:
>
> (1) Fill or refill a marked container with liquefied petroleum gas or any other gas or compound;
>
> (2) Buy, sell, offer for sale, give, take, loan, deliver, permit to be delivered, or otherwise use, dispose of, or traffic in a marked container; or
>
> (3) Deface, erase, obliterate, cover up, or otherwise remove or conceal any mark on a container.
>
> **§ 11–604**.
>
> Unless taken with the written consent of the owner, each of the following actions by any person, other than the person whose mark is on the container, is presumptive evidence of a violation of this subtitle:
>
> (1)   Use of a marked container;
>
> (2)   Possession of a marked container; or
>
> (3)   Purchase of a marked container for:
>
>   (i)   The sale of liquefied petroleum gas; or
>
>   (ii) The filling or refilling of the container with liquefied petroleum gas.
>
> **§ 11–606**.
>
> Any person who violates any provision of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding

> $300 or imprisonment not exceeding 90 days
> or both.

The statute defines a "marked" container as one that "bears on its surface in plainly legible characters the mark of its owner." CL § 11-601(e). A "mark" "includes any name, initial, or device." *Id.* § 11-601(d). An "owner" is "(1) Any person who holds a written bill of sale under which title or ownership to a container was transferred to him; or (2) Any manufacturer of a container who has not transferred ownership of the container under a written bill of sale." *Id.* § 11-601(f).

There are no reported cases interpreting Maryland's Container law, and not much legislative history. Originally enacted as part of the former Article 27 ("Crimes"), *see* 1968 Md. Laws, ch. 533, the Container Law was moved to Title 11 of the Commercial Law Article in 1975, without substantial change, as part of the Code revision process. *See* 1975 Md. Laws, ch. 49, § 1.[1] The Commission to Revise the Annotated Code explained, "Title 11 contains statutes generally intended to regulate trade and commerce in a relatively broad sense." Commission Report No. 175-1 to the General Assembly of Maryland (Jan. 10, 1975), at 8 (addressing the codification of various provisions into Article 11, Title 11, as proposed by 1975 House Bill 26). The Container Law remains in the Commercial Law Article under the title "Trade Regulation," without reference to the statutes codified in the Public Safety Article that authorize the State Fire Commission to regulate the use, handling, and placement of LPG containers.

The National Propane Gas Association ("NPGA") reports that at least 42 states had adopted container laws or regulations as of 2012. NPGA, *Propane Container Filling Laws, Regulations and Standards: The Safety Reasons Supporting Accountability* at 6 (March 2010, rev. Jan. 2012), *available at* http://www. npga.org/ files/NPGA%20Container%20Law%20White%20Paper%20 (Jan%202012)(1).pdf (last visited Nov. 19, 2013). Like Maryland's container law, the restrictions enacted in other states typically prohibit anyone other than the owner of a tank from (a) filling the tank; (b) taking, using, or disposing of the tank, or (c) defacing the

---

[1] The General Assembly also amended the Container Law in 1975 to adopt a standard definition of "person" throughout much of the Commercial Law Article. 1975 Md. Laws, ch.49, § 3.

mark on the tank. *See, e.g.,* Va. Code Ann. § 18.2-494 (2013); Del. Code Ann. tit. 16, § 7202 (2013); Minn. Stat. § 299F.40 (2013).

Of the three actions prohibited by such laws, the "ownership filling" requirements have proven to be the most controversial. Although industry representatives emphasize the safety benefits of ownership filling requirements, *Propane Container Filling Laws* at 2-3, some states have questioned whether such requirements principally serve as restraints on trade that "prevent[] consumers from choosing their propane suppliers." *Connecticut's Regulation of Propane, Legislative Program Review and Investigation* at 21 (2011), *available at* http://www.cga.ct.gov/pri/docs/2011/ Connecticut_Regulation_ of_Propane_Final_Report.PDF); *see also* Op. Utah Atty. Gen., No. 90-27 (March 5, 1991) (concluding that Utah's ownership filling requirement constitutes a "restraint of trade" in violation of state and federal antitrust laws and is preempted by federal antitrust law).[2] By contrast, the prohibition on non-owners taking, using, or disposing of another company's tank—about which you inquire—has not achieved the same notoriety, perhaps because such prohibitions often do little more than re-state generally applicable theft laws.

## D.   *The Facts Posited Here*

In the situation you posit, a residential LPG customer has decided to contract with a new supplier for the provision of LPG gas

---

[2]   The NPGA reports that the Utah Attorney General's opinion was subsequently "overturned" by a decision of the U.S. District Court for the District of Utah in a declaratory judgment action. *Propane Container Filling Laws* at 2 (citing *Suburban Propane Div. of Quantum Chem. Corp., et al. vs. D. Douglas Bodrero and R. Paul Van Dam*, Civ. Case No. 91-C-382G (D. Utah April 15, 1992)). The Attorney General's opinion nevertheless prompted the NFPA to delete the ownership filling requirement from the 1992 version of its model code and replace it with a provision allowing LPG tanks to be filled by "qualified persons." *Propane Container Filling Laws* at 2; *see* NFPA 58, § 7.2.2.1. In 1998, the committee responsible for revisions to the LPG portions of the model code approved an amendment restoring the ownership filling requirement only to have its decision reversed by the NFPA Standards Council, which is responsible for "the entire standards-making process and all the codes and standards." *NFPA 58: LP-Gas Code Handbook*, Comment to § 7.2.2.2 (2011 ed.). Although Maryland's Container Law continues to include an ownership filling requirement, *see* CL § 11-603, the tank-removal issues you raise do not require us to address the potential antitrust implications of that requirement.

and an underground tank to contain it. The new supplier has excavated the former company's underground storage tank from the customer's property in order to install the supplier's own tank. Neither the customer nor the new supplier has informed the other company in advance, let alone obtained that company's written consent to any conduct regarding its tank. The new supplier then places the former supplier's tank "by the side of a road with LP gas still inside." We have been told that new suppliers have left disused underground tanks in various places, sometimes on the customer's property, sometimes in the street in front of the property, and sometimes elsewhere entirely. We have no information on the role played by the customer in these events, but we assume that the customer has at least consented to the supplier's excavation and removal of the first company's tank from its position underground.[3]

## II

## Analysis

### A. The Excavation and Movement of an LPG Tank from the Customer's Property, Depending on Other Facts, May Form the Basis of a Criminal Prosecution

The Container Law makes it a misdemeanor to, among other things, (1) "take, . . . deliver, permit to be delivered, or otherwise use, [or] dispose of" (2) a marked LPG container that (3) has a capacity of over five liquid gallons, (4) without the written authorization of the container's owner. *See* CL §§ 11-602, 11-603(2). The defendant's "use" or "possession" of the marked container is presumptive evidence of a violation of the statute. *Id.* § 11-604. We understand your inquiry to be directed primarily at whether the first element, which consists of the acts set forth in CL § 11-603(2), would be met by proof that the new supplier placed the first company's tank by the side of the road.

The only acts proscribed by CL § 11-603(2) that might apply here are the "taking" or "disposing of" the container.[4] The statute

---

[3] We have not analyzed, as beyond the scope of the inquiry, the potential culpability of the customer under the Container Law or the supplier as an accessory to violations by the customer.

[4] Your letter does not suggest that the supplier has "sold," "delivered," "used," "filled," or committed any other of the prohibited acts with regard to the container.

does not define either term, so we will first look for their meanings within the larger context of the statutory scheme in which they appear. *See, e.g.*, *Lockshin v. Semsker*, 412 Md. 257, 276 (2010). In that context, one indication of what the General Assembly intended by the terms "take" and "dispose of" may be found in CL § 11-605, which sets forth the remedies available to the owner of a tank that has been handled in a manner that violates the Container Law. In such cases, the owner may obtain a warrant against any person who "has violated any provision of [the Container Law]" to require him "to be brought into court for the purpose of discovering and obtaining the container." CL § 11-605(a). If, as posited by your request, the new supplier has simply left the LPG tank "by the side of the road" in front of the customer's house, it seems unlikely that the owner would require judicial intervention to "discover[] and obtain[]" it. Rather, the relief available by statute suggests that the General Assembly may have envisioned violations that involved some type of spiriting away of the tank.

But a civil remedy available to an owner of a missing tank does not necessarily limit the meaning of terms that could also form the basis of a criminal prosecution for other types of offending conduct. The remedy, we think, does not limit the law.[5] So we continue our search for legislative intent by considering the way in which the General Assembly has used the terms "take" and "dispose of" in other statutes, *see, e.g.*, *TransCare Maryland, Inc. v. Murray*, 431 Md. 225, 249 (2013) (looking to "other parts of the Maryland Code" for the typical use of the terms in question), and to their meanings in 1968, when the law was enacted, *see Chow v. State*, 393 Md. 431, 448 (2006) (analyzing a term "in light of the definitions in effect at the time of the legislative enactment").

### 1. "Dispose Of"

The most likely offense suggested by the new supplier's movement of the other company's LPG tank to the side of the road is the offense of "disposing" of the tank without the owner's written authorization. When, as here, the term has been used in a statute along with words such as "sell" or "give," we have construed it to

---

[5] We note that the Revisor's Note accompanying amendments to the Container Law in 1975 "question[ed] whether retention of [§ 11-605], with the specific and unique procedures established by it, is necessary in light of the general procedures which normally apply to actions of this sort." 1975 Md. Laws, ch. 49, § 3. Given that the section may not have been necessary, we are reluctant to view it as a substantive limit on the scope of the Container Law as a whole.

capture a broad array of ways in which one might transfer property. In 1970, construing a statute regulating the disposition of confiscated firearms, we concluded that the term "disposal" included various methods of disposition, including destruction:

> "Disposal" is defined as sale, pledge, giving away, using, consumption, or any other disposition of a thing. See *Black's Law Dictionary*. The same source defines the term "dispose of" as "to exercise finally, in any manner, one's power of control over; to pass into the control of someone else; to alienate, relinquish, part with, or get rid of; to put out of the way; to finish with; to bargain away". See also 12(A), *Words and Phrases*, 492, which clearly acquaints disposal with action to get rid of property in some manner.

55 *Opinions of the Attorney General* 313, 315-16 (1970); *see also* 58 *Opinions of the Attorney General* 808, 811 (1973) (concluding that the phrase "or otherwise dispose of," used in a statute applicable to any person who "shall barter or sell or otherwise dispose of, or shall offer for sale any goods," was "clearly broad enough" to include the consignment of the goods for sale by someone else).

Construing the term "disposal" in a 1969 contract, the Court of Appeals similarly turned to a "common dictionary meaning" of the term: "the 'sale, pledge, giving away, use, consumption or any other disposition of a thing.'" *Harford County v. Town of Bel Air*, 348 Md. 363, 385 (1998) (quoting *Black's Law Dictionary* at 557 (4th ed., 1951)). The term has long been used as a catch-all for various types of transfers of property; in 1858, for example, the Court, discussing a law restricting the sale of liquor, explained that the Legislature used words other than "sell"—"such as 'dispose of' or 'give'"—to prevent transfers of alcohol by other methods. *See Franklin v. State*, 12 Md. 236, 247-48 (1858).

Here, a supplier who has removed the tank from the customer's land and deposited it out in the street has likely "g[otten] rid of" it, 55 *Opinions of the Attorney General* at 315, and thus "disposed of" it within the Black's Law Dictionary definition quoted above. However, a supplier who has excavated another company's tank and left it on the customer's land, even "by the side of the road,"

probably has not "disposed of" the tank, because the tank has remained in the actual possession of the customer[6] and remains the property of the company that owns it—no one has "gotten rid of" it. Your ability to allege that a tank was actually "disposed of" thus would likely depend on what the supplier did with the tank after excavating it.

### 2.    "Take"

The next possibility is that the supplier "takes" an LPG tank within the meaning of CL § 11-603 when the supplier excavates it and moves it to a different location, either on or off the customer's property.  We did not find any reported cases on the term as used in either Maryland's Container Law or similar container laws in other states.  However, given that the General Assembly originally included the Container Law within the same Article as the Code's criminal offenses, *see* Art. 27, §§ 355A-355G (1967 Repl. Vol., 1968 Supp.), the use of "taking" in the context of larceny cases from that period may suggest what the 1968 General Assembly understood the term to mean.[7]

As explained by the Court of Special Appeals in one such case from the time, "taking" is a crime against lawful possession, regardless of ownership:

> "[T]aking" refers to the taking of possession
> from possession of one entitled thereto.  Thus
> it must be a trespassory taking and trespass

---

[6]    The customer, if not a lessee in possession of the tank, likely at least possesses the tank as a bailee, *i.e.*, a person to whom the tank owner has entrusted the tank for a particular purpose.  Bailees are deemed to have temporary "possession" of the bailed goods.  *See*, *e.g.*, *Jones v. State*, 304 Md. 216, 219 (1985) (stating that the bailment of a car to the defendant for repair involved a transfer of possession).

[7]    The Container Law was enacted before the theft crimes were gathered into the Consolidated Theft Statute, which the General Assembly enacted in 1978 to "eliminate technical and absurd distinctions" between different offenses, and to address the "plethora of special provisions" that those distinctions had engendered.  *Jones v. State*, 303 Md. 323, 328 (1985) (quoting Joint Committee on Theft Related Offenses, Report on Revision of Maryland Theft and Bad Check Laws at 19 (1978)).  Because "take" now falls within the statutory definition of "deprive" in the theft statute, *see* Md. Code Ann., Crim. Law ("CR") § 7-101(c) (2012 Repl. Vol.), we have looked to the pre-consolidation cases for the General Assembly's probable understanding of the word in 1968.

against possession is the matrix of the common law larceny concept. There has been a constant judicial struggle to ascertain who has possession because an accused cannot, in legal contemplation, trespass against a person's property, if that person does not have possession. In general, the taking of possession from another is always a trespass unless with the consent of the other.

*Farlow v. State*, 9 Md. App. 515, 517 (1970) (citations and footnote omitted). In *Robinson v. State*, 17 Md. App. 451, 458-59 (1973), for example, the court stated that the defendant could not be convicted for the larceny of a rental car without proof of a trespassory taking from the rental customer, because the customer had been the person in possession on the day the car was taken. Here, because the customer—rather than the former supplier—is in possession of the tank, there could be some doubt as to whether a new supplier who has removed a tank with the consent of the customer has "taken" it within the plain meaning of the term as construed by courts when the Container Law was enacted.[8]

But allowing the consent of the customer, as the party in possession, to determine the legality of the new supplier's removal of the tank—as the reasoning of *Farlow* and *Robinson* suggests— would present its own interpretive difficulties. The plain language of CL § 11-603 prohibits the "tak[ing]" of a tank without the written consent of the *owner*, not the *customer*. Given that we are to construe statutes in such a way as to give effect to every term used by the General Assembly, *see Mayor of Oakland v. Mayor of Mt. Lake Park*, 392 Md. 301, 327 (2006), we do not believe that a definition of "taking" in Maryland larceny jurisprudence serves as a useful guide for how we are to interpret the term "take" as used in the Container Law. Under the plain language of the statute, the fact that a customer has permitted the removal or relocation of the tank would not seem to be relevant.

---

[8] We emphasize that we are discussing the crime of theft as it existed in 1968. The "new and broader crime of theft" embodied in the Consolidated Theft Statute after 1978 "'no longer makes necessary[] what once were the trespassing, taking and carrying away elements of common law larceny.'" *In re: Antoinette*, 200 Md. App. 341, 348-49 (2011) (quoting Moylan, *Maryland's Consolidated Theft Law and Unauthorized Use* § 4.2 at 24 (MICPEL, 2001)).

Other aspects of Maryland's larceny jurisprudence, however, seem more directly applicable and weigh against interpreting the word "take" to require the removal of the tank from the customer's property. The Container Law proscribes the "tak[ing]" of an LPG tank, not its "carrying away." The two terms are understood to be distinct from one another, *see, e.g.*, *Harris v. State*, 353 Md. 596, 615 n.12 (1999) (noting the distinction between "taking" and carrying, or "asportation" for purposes of carjacking statute), which cautions against reading "take" to require some form of absconding, lest we "place in the statute language which is not there." *Leppo v. State Highway Admin.*, 330 Md. 416, 423 (1993) (quoting *Simpson v. Moore*, 323 Md. 215, 226 (1991)).

At the same time, we have not found any indication that the General Assembly intended to use the term "take" in this legal, technical manner instead of in its more common sense, meaning: "[T]o get into one's hand or into one's possession, power, or control . . . ." *Webster's Ninth New Collegiate Dictionary* 1202 (1989). Given that a reviewing court might well "approach the analysis of the language from a common sensical, rather than a technical perspective," *Motor Vehicle Admin. v. Chamberlain*, 326 Md. 306, 315 (1992), *superseded by statute on other grounds, as recognized in Motor Vehicle Admin. v. Delawter*, 403 Md. 243, 265 n.12 (2008), we cannot say with confidence that an LPG company that excavates a tank but leaves it on or adjacent to the customer's property has "take[n]" the tank within the meaning of the Container Law.

Nor does the Container Law reflect the kind of "clear purpose," *Bonds v. Royal Plaza Cmty. Assocs.*, 160 Md. App. 445, 458 (2004) (quoting *River Birch Assoc. v. Raleigh*, 326 N.C. 100, 109 (1990)), that would compel it to be interpreted broadly. It could be argued that the statute reflects a strong policy goal—public safety—that supports a broad construction of the term "take" that would forbid the movement of an LPG tank by anyone other than its owner, who presumably knows best how to do so safely. However, when the General Assembly enacted the Container Law, it had already entrusted the regulation of combustible and explosive materials to the Fire Commission and had already mandated the adoption of the Fire Code, which addresses the proper handling of LPG tanks without respect to ownership. This order of enactment suggests that the Legislature did not intend the Container Law as a public safety measure, but instead "generally intended to regulate trade and commerce," as the code revision commission concluded. Commission Report No. 175-1 at 8. In the absence of meaningful legislative history suggesting otherwise, we are unable to discern a

clear purpose that would compel an expansive, remedial construction of the law.

Rather, we think that the one interpretive rule that clearly applies here—the rule of lenity—weighs against a broad construction of "take" or "dispose of." Under the rule of lenity, "courts will not extend the punishment to cases not plainly within the language used [by the Legislature]." *Jones v. State*, 304 Md. at 220 (citation and quotation marks omitted); *see also Walker v. State*, 432 Md. 587, 627 n.26 (2013) (describing the rule as an aid to resolving an ambiguity in a criminal statute). Given that rule, we cannot say that the new supplier's movement of a tank "by the side of the road" with the consent of the customer falls plainly within the language used by the Legislature when it prohibited the "taking" or "disposal of" of a marked tank without the owner's written consent.

### 3.   The Statute's Evidentiary Presumption

Although the rule of lenity counsels against finding that this type of conduct is proscribed by the Container Law, we must consider whether the evidentiary presumption established by CL § 11-604(2), which is triggered by a person's "possession" of a marked container, would make it any easier to prosecute the supplier for "disposing of" or "taking" the other company's tank. In our view, the presumption would not change the conclusions we reach above.

At first glance, it would seem that a supplier who picks up an underground storage tank with heavy equipment has "possession" over it; the supplier has acquired a degree of control over the tank and is exerting that control, and "control" over a thing has long been deemed "possession" of that thing. *See, e.g.*, *Polansky v. State*, 205 Md. 362, 366 (1954) (stating that possession occurs "as soon as one obtains a measure of control or dominion over the custody of the goods"). However, as explained by the Court of Special Appeals, not every act of control over a thing rises to the level of "control" or "possession" of it. *Burns v. State*, 149 Md. App. 526, 551 (2003). Instead, "possession generally contemplates something more by way of continuing and exclusive exercise of dominion and control over property than is required to show that a defendant was merely a participant or joint possessor in some variety of prohibited, but possibly short-lived, behavior." *Id*. Whether the supplier has acquired enough control over the tank to be deemed to "possess" it for the purposes of the evidentiary presumption may again depend on whether the supplier was merely leaving the tank on the

customer's property for the customer's disposition, or, instead, exercising a continuing and exclusive dominion over it by removing it from the customer's possession. In our view, then, the presumption adds little to how the statutory scheme applies to the scenario you describe.

In any event, the existence of the presumption would not excuse the prosecution from proving the acts of taking or disposal. *Graham v. State*, 151 Md. App. 466, 483 (2003) (explaining that "a mandatory presumption" still requires that the jury be "instructed that the presumption was rebuttable *and* that it did not shift the burden of persuasion to appellant" (emphasis in original)). Although we believe you have arguments available that would allow you to charge such acts, the considerations described above—the lack of a statutory definition of the operative terms, the absence of meaningful legislative history, and the application of the rule of lenity—suggest that a charge under this statute might be difficult to prove when the new supplier has left the tank in a readily accessible location on, or immediately adjacent to, the customer's property.

**B.    Leaving a Partially Filled LNG Tank "By the Side of the Road" May Constitute a Criminal Violation of Other Laws Relating to Public Safety.**

We are quick to add, though, that other public safety laws may prove a more effective means of prosecuting the conduct you describe. Section 6-317 of the Public Safety Article, for example, prohibits the alteration, maintenance, or use of equipment or land in a way that "endangers life or property due to the hazards of fire or explosion." PS § 6-317(a)(1). The actions you describe may also violate the NFPA 58 standards for the storage, handling, transportation, and use of LPGs, which have been adopted into the Maryland Fire Code. COMAR 29.06.01.06 (incorporating NFPA Fire Code 1 (2012 ed.) by reference); NFPA Code 1, §§ 2.1, 2.2 (incorporating NFPA 58, Liquefied Petroleum Gas Code, by reference). The Fire Code "has the force and effect of law in the political subdivisions of the State." PS § 6-206(a)(iii). The model code provisions that might apply to the scenario you describe include those that require most LPG tanks to be installed within certain distances from dry grass and other combustibles, overhead electrical lines, sources of ignition such as window air conditioners, "public vehicular thoroughfare[s]," and "designated parking locations." NFPA 58, §§ 6.6.5.2, 6.4.4.3, 6.3.2.3, 6.6.6.1(B), 6.6.6.1(E), and 6.6.1.2; Annex J. Although these provisions are part of the regulations for "installation" of LPG containers, courts may conclude that they were intended to apply to the placement of

containers after their removal as well.  If so, the knowing violation of any of these provisions is a misdemeanor.  PS § 6-601.

Depending on the circumstances, § 7-104 of the Criminal Law Article might also apply; that theft statute provides that a person may not exert unauthorized control over property if the person "abandons the property knowing the . . . abandonment probably will deprive the owner of the property."  CR § 7-104(a)(3).  And a supplier who knowingly places a leaking tank by the side of the road or otherwise leaves it in a condition that "creates a substantial risk of death or serious physical injury to another" could potentially be prosecuted for reckless endangerment under § 3-204(a)(1) of the Criminal Law Article.  *See Kilmon v. State*, 394 Md. 168, 174 (2006) (guilt under the reckless endangerment statute does not depend on "whether the defendant actually intended that his reckless conduct create a substantial risk of death or serious injury").  Other provisions of the criminal code might apply, as might the provisions of subject-specific articles ranging from local littering and nuisance ordinances to federal regulations on the safe transport of LPGs.  The many prosecutorial choices offered by these laws suggest that there is likely little need to read the Container Law expansively.

## III

### Conclusion

Depending on the circumstances, the Container Law might provide a route to prosecuting an LPG supplier for leaving a tank "by the side of the road" in a place beyond either the customer's or owner's control.  However, given the lack of statutory definitions of the operative terms of the Container Law, the absence of meaningful legislative history, and the rule of lenity, the Container Law likely would not provide the most direct path for prosecuting a supplier for that conduct.  In cases where the supplier leaves a partly-filled propane tank in a place where it might be hit by traffic, vandalized, or otherwise damaged, prosecution for reckless endangerment under § 3-204(a)(1) of the Criminal Law Article may be the best response, as might a prosecution under the Public Safety Article, which incorporates the extensive State Fire Code regulations on the handling of liquefied propane gas.

Douglas F. Gansler
*Attorney General*

D'Arcy Talley
*Assistant Attorney General*

Adam D. Snyder
*Chief Counsel, Opinions & Advice*